THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID G. LINDSAY II, Defendant-Appellant.

Fourth District   No. 4—89—0469

Opinion filed February 15, 1990.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

On April 21, 1989, the circuit court of Macon County entered judgment on a jury verdict returned finding defendant David G. Lindsay II guilty of the offense of second degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2.) The court subsequently sentenced him to an

extended-term sentence of 19 years' imprisonment.

On appeal, defendant contends the court abused its discretion in sentencing him. He indicates the minimum sentence for first degree murder is 20 years' imprisonment. He argues that, in sentencing him to a 19-year extended term for second degree murder, the court essentially sentenced him for first degree murder and rejected the mitigating evidence which the jury apparently accepted in finding him not guilty of the latter offense. For the reasons hereinafter stated, we affirm.

The evidence presented at trial revealed that, on December 20, 1988, Decatur police responded to a "911" telephone call they received from defendant in which he identified himself and informed the police that "something terrible ha[d] happened," that he did not want his three children going home because "they [would] find [his] wife dead on the floor."

Upon arriving at the Lindsay residence, Decatur police discovered the body of a woman, later determined to be defendant's wife, Christine Lindsay, lying on the kitchen floor with a plastic bag over her head. The police observed a lot of blood around the body and more blood about the kitchen. They discovered an unattached, chrome table leg near the woman's body which was smeared with blood.

The Daytona Beach Shores police apprehended defendant in Florida on December 26, 1988. In his car, the police found a large garbage bag filled with blood-soaked towels and other items. They also discovered a broken radio and a pipe with red stains on them and a Christmas card which had the following message on it: "I'm D. L., 29 Ohio Drive. I have killed my wife. She is in my kitchen."

A police officer testified that defendant told him he and his wife had gotten into an argument over money problems on the morning in question, during which his wife had tried to cut him with a steak knife and tried to hit him with a table leg and a radio. The officer said defendant admitted he was able to get the latter items away from her and struck her with them several times. The officer said he did observe some small cuts on defendant's hands but did not notice any injury to his face or body. He said he did not complain about any type of injury elsewhere on his body.

The officer said defendant told him he cleaned up the kitchen area and himself, and tried to keep his youngest son in the basement during that time. He then took that son to his parents and called the police from a mall to tell them his wife was dead.

Defendant took the stand in his own defense. He stated that, around the date in question, he and his wife had been experiencing

financial problems. He had just gotten paid on December 15, 1988, and was not expecting any more money before Christmas. They both wanted their 1988 Christmas to be better than their 1987 Christmas, which had been "small" because he had been out of work.

Defendant testified that, because his wife was depressed about their financial situation, he lied to her and told her he had additional monies coming to him. On the evening of December 19, 1988, he showed her a photocopy of a check which he had "doctored" to make it look like a new check. Defendant stated his wife told him it looked like a copy to her, and they discussed it briefly.

On the morning of December 20, 1988, defendant woke up around 6:50 a.m. and took his daughter and son to school. Defendant said that, when he returned home around 8:30, his wife brought up the subject of the check. He said she questioned him about it in an angry tone of voice. He stated the next thing he knew she was coming at him with a knife and tried to stab him with it. He said he received several small cuts on his hand when he attempted to knock the knife away from her and then grabbed it from her.

Defendant stated his wife then lunged at him, knocked him off balance and hit him twice in the head with an iron pipe. He indicated the blows even knocked off his glasses. Defendant identified a bent pair of glasses with a missing lens and a broken nose piece as his own glasses. He admitted his wife's actions at that point had "angered" him, and he knew he had to do something to get her away. He said he put his hands on her face and pushed her backward.

He said his push caused his wife to back into the kitchen table, and one of the legs from that table came loose and tipped over. He stated she again came at him with the pipe, and, because he believed his wife was going to hit him with it, he used his daughter's radio to block it. Defendant admitted his block attempt made the pipe and the radio fly into his wife's face, and she sustained cuts to her face as a result. He further acknowledged he noticed blood around her eye and mouth at that point.

Defendant stated his wife's response was to push both the radio and pipe back at him. He said the act did not cause him any physical harm because she did not hit him that hard. He again pushed his wife away, and she lost her balance and fell on the ground. He said that, while on the ground, she grabbed the table leg which had fallen. In response, he picked up the pipe which had fallen. He said that, when his wife saw he had the pipe, she came at him swinging the table leg.

Defendant said he again pushed her away, but she came at him again with the table leg and hit him in the head. He stated he swung

the pipe at her and believed he hit her. The blow he received from the table leg also knocked him off balance, and he ended up on the floor. He said his fall caused him to lose the pipe, so he grabbed the table leg from his wife. His wife picked up the pipe, lunged at him with it and hit him in the head. He said, in response, he swung the table leg at her and hit her in the head.

Defendant stated that, at that point, his wife had hit him several times in the head, and he was feeling dizzy. He said that was all he could recall about the scuffle, and the next thing he knew, he woke up and saw his wife on the floor surrounded by a lot of blood. He said he checked her pulse, and she did not have one.

Defendant said he had not intended to kill his wife or cause her serious physical harm. He indicated that, when he struck his wife during their scuffle, he was doing no more than trying to prevent her from hitting him. He admitted that, as the fight progressed, he had become more and more angry about it. He said he was very upset about what had happened.

He subsequently left the kitchen to check on his three-year-old son to make sure he was okay. He said he also threw his clothes in the washer and cleaned up the kitchen so his son would not see the mess. He stated he also placed a plastic bag over his wife's head because he did not want his son to see her and the sight was also bothering him. He took his son to his mother's house and then called "911" to report the incident because he did not want his other children to come home from school and find their mother. Finally, he said he started driving with no destination in mind and ultimately ended up in Florida.

The pathologist who performed the autopsy on the body of Christine Lindsay testified he discovered six wounds on the back side of her head. He described one wound as "large" and "gaping" and the remaining wounds as smaller in size. He noted, however, that, with regard to all six of the wounds, the entire thickness of the scalp had been penetrated, and they tended to go down to the actual surface of the skull. He estimated a minimum number of six blows would have to have been inflicted in order to result in the wounds he described.

The pathologist further testified he observed four wounds on Christine Lindsay's face. The wounds were smaller in size but, again, were deep and penetrated fairly close to the skull. He also stated the inner lining of her lip was torn apart and a considerable amount of tooth material was missing from her mouth. In addition, he observed bruising about her shoulder, back, chest, arms, elbows, and hand and knuckle regions.

The pathologist stated that, in examining the actual skull of Chris-

tine Lindsay, he found a transverse fracture which went clear across the base of her skull and also uncovered a depressed skull fracture, where a plate of the skull had become detached from the remainder of the skull and went into the superficial part of her brain. He said she had sustained brain injuries, including hemorrhaging.

The pathologist testified the chrome table leg found at the crime scene was compatible with inflicting several of the wounds he found on the back of Christine Lindsay's head. He further stated considerable force was required to result in the wound immediately above the depressed skull fracture he found. He also said the broken radio was consistent with the injuries located on her face. He concluded Christine Lindsay died from the head injuries she received upon the impact of a blunt instrument of some type against her head.

Defendant had been charged with first degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1).) At trial, the jury was instructed as to both first and second degree murder. The instruction with regard to second degree murder stated the jury should find him guilty of that offense if, after determining the factors for first degree murder are present, it concludes a preponderance of the evidence showed:

"[D]efendant, at the time he performed the acts which caused the death of Christine Lindsay, believed the circumstances to be such that they justified the deadly force which he used, but his belief that such circumstances existed was unreasonable or that the defendant, at the time he performed the acts which caused the death of Christine Lindsay, acted under a sudden and intense passion resulting from serious provocation by the deceased."

The jury returned a verdict finding defendant guilty of the offense of second degree murder.

At the sentencing hearing, the State presented no evidence in aggravation, but asked the court to consider the evidence produced at trial. Defendant called several witnesses both at trial and at sentencing who testified defendant had a reputation for being a peaceful and law-abiding citizen and was a very conscientious worker.

In imposing a 19-year sentence for the offense of second degree murder, the court stated as follows:

"[T]he court having considered the evidence at trial, the presentence report, the evidence presented in aggravation and mitigation, the arguments of counsel and the sentencing alternatives together with the defendant's right of allocution, and the court having regard for the nature and circumstances of the offense and the history and character of the defendant,

finds that probation would deprecate the seriousness of the offense and [would be] inconsistent with the ends of justice. The court further finds that the offense committed was accompanied by brutal and heinous behavior indicative of wanton cruelty."

The court also further stated it "ha[d] found that circumstances *** exist[ed] to warrant the imposition of a sentence of extended term for which [he] ha[d] been sentenced to the Department of Corrections for a period of 19 years."

In *People v. Evans* (1980), 90 Ill. App. 3d 707, 413 N.E.2d 441, *aff'd* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, a trial court entered judgment on a jury verdict finding a defendant guilty of voluntary manslaughter and aggravated battery, and it imposed an extended-term sentence for the voluntary manslaughter offense because it found defendant's acts had constituted wanton cruelty. This court vacated the extended-term sentence and remanded for resentencing.

The Illinois Supreme Court agreed with this court that defendant's voluntary manslaughter offense was not accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. It further opined that "actions committed under a subjective belief, albeit unreasonable, that the actions were in self-defense *do not constitute wanton cruelty.*" (Emphasis added.) (*Evans*, 87 Ill. 2d at 88, 429 N.E.2d at 525.) Thus, it concluded the trial court had erred in imposing an extended-term sentence for defendant's voluntary manslaughter conviction.

The State here relies heavily upon the first district case of *People v. Moore* (1987), 159 Ill. App. 3d 1070, 513 N.E.2d 87. The evidence in *Moore* showed a defendant and two other men brutally and savagely beat a 14-year-old boy who had broken into the home of one of the men and had retreated to the basement in order to avoid their beating. Defendant was found to have killed the boy under an unreasonable belief that he was acting in self-defense and was convicted of voluntary manslaughter, among other offenses. The trial court imposed an extended-term sentence for the offense of voluntary manslaughter because it found his actions had been heinous and extremely and excessively brutal.

On appeal, that defendant contended it was inherently improper for a trial judge to impose an extended term for voluntary manslaughter. He relied upon *Evans*, in part, to support his contention. The first district rejected defendant's argument, however, finding the *Evans* court did not so hold. Rather, it concluded the supreme court there found that defendant had not acted with wanton cruelty, and, there-

fore, an extended term was not appropriate under the circumstances. Because the first district determined Moore had clearly acted with savagery and unrelenting brutality, it found no error in the imposition of an extended-term sentence in that case.

■■ While we interpret the *Evans* court to hold that an extended-term sentence cannot be imposed on a defendant convicted of voluntary manslaughter whose actions were committed under a subjective belief, albeit unreasonable, that his actions were in self-defense, we need not pass upon the propriety of *Moore* in order to decide the instant case. Here, the jury also was instructed it could return a guilty verdict for second degree murder if it found defendant had acted under a sudden and intense passion following serious provocation by his wife. Under the evidence presented, the jury could have made such a finding.

■■ We agree with the third district decision in *People v. Kalec* (1982), 109 Ill. App. 3d 696, 440 N.E.2d 1254, that the holding in *Evans* should not be extended to a killing involving sudden and intense passion. Clearly, a murder performed by someone acting under such sudden and intense passion following provocation by the victim can be accompanied by brutal or heinous behavior indicative of wanton cruelty.

■■ Here, the victim received repeated and severe blows to her head, face, and body and died from hemorrhaging to her brain. The defendant sustained minor injuries. We conclude under these circumstances defendant's conduct was indicative of wanton cruelty, and the trial court properly imposed an extended-term sentence.

For the reasons stated, the judgment of the circuit court of Macon County is affirmed.

Affirmed.

KNECHT, P.J., and McCULLOUGH, J., concur.