THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY CHAVEZ *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—89—1791, 1—89—1792 cons.

Opinion filed February 3, 1992.—Rehearing denied May 6, 1992.—
Modified opinion filed May 11, 1992.

Frederick F. Cohn, of Chicago, for appellant Anthony Chavez.

Julius Lucius Echeles, of Chicago, for appellant Dean Chavez.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal. Defendants Anthony Chavez,[1] Dean Chavez, Edward Manzo, Ralph Gabriel and James Kennedy were charged by indictment with the murder of John Mathews, a Chicago police officer. Following a bench trial, Anthony and Dean Chavez (brothers) were found guilty of second degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(d)), and each sentenced to extended prison terms of 27 years. Gabriel was sentenced to 10 years after being convicted in a separate jury trial, and Kennedy pleaded guilty to murder and received a 20-year sentence. Manzo had not yet been tried as of the date of this appeal. Ralph Gabriel and James Kennedy are not parties to this appeal.

On appeal, defendant Dean Chavez, individually, contends that: (1) the trial court erred in denying his motion to quash arrest and suppress his oral statement because the arrest was not based on probable cause. Dean and Anthony Chavez each contend that: (2) the evidence at trial was insufficient to support convictions of second degree murder; (3) defendants' sentences of 27 years are excessive where a codefendant who was no less culpable was convicted by a jury and sentenced to 10 years; (4) an extended-term sentence is unconstitutional and contrary to the laws of the State of Illinois; and (5) a 27-year sentence violates the eighth amendment of the United States Constitution. For the following reasons, the judgment of the trial court is affirmed.

### MOTION TO QUASH AND SUPPRESS

Prior to trial, defendant Dean Chavez moved to quash his arrest and suppress his arrest statements. Annette Miller testified that she lived at 13106 South Burley Avenue in Chicago with her daughters Susan and Debra. Dean was her daughter Susan's boyfriend and on occasion shared Susan's bedroom. Dean had his own key to her house. On Friday, May 20, 1988, at approximately 10 or 11 p.m., she fell

---

[1]Note that throughout the record the names "Tony" and "Anthony" are used interchangeably and refer to the same defendant. The notice of appeal uses the name "Tony Chavez," while the order of sentencing and commitment uses "Anthony Chavez." In addition, the appendix to the trial record refers to the testimony of "Anthony Chavez," and defendant so identifies himself on the witness stand.

asleep on the living room couch. She was awakened by the doorbell and pounding on the front window at approximately 3:45 a.m. She saw a man holding a police badge up to her window, but didn't see anyone in uniform. She opened the door for the detectives and one of them asked where Susan's room was. She took the officer to Susan's bedroom door.

Mrs. Miller knocked on the door and told Susan to open the door. When Susan did not answer, the police started pounding and banging on the bedroom door. Then Debra came out and pounded on the door and told Susan to open the door. Susan opened the door, and Mrs. Miller could see into the room and that Dean was in bed covered up. Mrs. Miller said that the officers told her that there was a party at the lake, and that somebody is dead, but that it was "probably over drugs and it's nothing to worry about."

On cross-examination, Mrs. Miller stated that Dean did not pay rent for staying in her home and did not get mail there. Mrs. Miller cleaned her daughter's room.

Susan Miller testified that on May 20 she came home at 11:30 p.m. and went straight to bed. Dean was not there when she got home, and she did not know he was there until 3:45 a.m., when she heard pounding on the door. She opened the door and a police officer asked who was in the bed. Susan said "my boyfriend, Dean Chavez." She stated that the officers took Dean out in handcuffs.

Frank DeMarco, a Chicago police department evidence technician, testified that on May 21, he investigated a homicide at 13029 South Avenue M at 2 a.m. He saw that Mathews had been brutally beaten about his head, face and body, and found brain matter and pieces of skull on the ground in a pool of blood 30 feet west of Mathews. He also saw a large piece of concrete and a bloody brick. He took a footwear impression and later made a plaster cast of a gym shoe footprint. There were numerous footwear impressions.

At the scene, DeMarco saw a damaged, yellow Oldsmobile, license number DVG 864, about 50 feet from Mathews' body and a bloody baseball bat near the rear fender. About 50 to 100 feet away he saw a gray Oldsmobile, license number AMK 270.

Next, Officer Daniel McWeeny testified that on the night of May 21 he went to the scene and saw a damaged, yellow Oldsmobile Cutlass, and a baseball bat floating in the lake. The car was registered to Daniel Chavez. Mathews' body was 10 to 15 feet from the car.

At 2:30 a.m., while McWeeny was canvassing the neighborhood, he encountered Amy Scalone and Jennifer Nelson. Nelson told him that she and her friends had been at a party at Wolf Lake and that

the car they were investigating belonged to Anthony Chavez. She identified the second car in the area as belonging to Dean Chavez. She viewed Mathews' body and said that he was much smaller than either of the Chavez brothers.

Officer McWeeny asked Nelson if she knew Dean's and Anthony's whereabouts. She did not know where Anthony was, but said that Dean would probably be at his girl friend's home at 13106 South Burley.

Officer McWeeny and four other detectives went to 13106 South Burley at approximately 3:45 a.m. and knocked on the door. Mrs. Miller opened the door and asked McWeeny to identify himself. He did so, told her about the incident at the lake, and said that he wanted to speak with her daughter, Susan Miller. Mrs. Miller said "Why don't you come in," and he and Sergeant Manos entered the home.

Mrs. Miller went to Susan's room and tried to open the door, but found it locked. She knocked on the door and there was no response. Then a younger woman appeared and began knocking on the door. When there was no response, Officer McWeeny said "Why don't you let me try," and knocked on the door. Susan finally opened the door. She had a sheet wrapped around her.

Officer McWeeny asked Susan about Dean Chavez. He noticed a figure wrapped entirely in blankets curled up on the bed up against the wall. He asked Susan if the figure was Dean and she glanced over toward the bed but said nothing. Officer McWeeny saw the covers moving and said "Dean, get up. I got to talk to you." He stepped into the bedroom and turned on the light. Dean got up and stood on the bed and Officer McWeeny noticed a large, fresh wound on Dean's leg. Then Dean got off the bed and backed away from the officer. As Officer McWeeny approached Dean, he picked up Dean's pants from the floor to hand to Dean and noticed they were ripped and stained with mud and blood. He saw muddy gym shoes lying next to the pants.

When Officer McWeeny asked Dean what happened at Wolf Lake Dean turned away from him. Officer McWeeny handcuffed Dean and took him to police headquarters, where he removed the handcuffs and read Dean his *Miranda* rights. Dean stated that he understood his rights. Officer McWeeny told Dean he knew he had been out earlier with his brother Tony and Ed Manzo. Dean did not ask to speak to a lawyer or to make any telephone calls.

Officer McWeeny further testified that at approximately 6:30 a.m., May 21, he learned that the victim was a police officer. At 8 a.m. he again spoke with Dean at the police station. He reminded Dean of his *Miranda* rights, and Dean stated that he remembered them. Dean did

not state that he wanted to speak to a lawyer or family members. Officer McWeeny talked to Dean for about 45 minutes.

At 9:15 a.m. Officer McWeeny called the State's Attorney's office. Assistant Joan O'Brien came to police headquarters and interviewed Dean. McWeeny and a court reporter were present when Dean gave a statement to O'Brien which concluded at 12:17 p.m.

Following argument, the trial court denied Dean's motion to quash arrest and granted Dean's motion to suppress as to the written statement taken by the court reporter in the presence of Officer McWeeny and Assistant State's Attorney O'Brien. The court granted defendants' motion for severance from the trials of Ralph Gabriel, Edward Manzo and James Kennedy, and defendants waived jury requests.

TRIAL

At trial, John Thibault, a Chicago police detective, testified on behalf of the State that he lived at 13107 Avenue M, one-half block south of Wolf Lake, across the street from Mathews. At 11:30 p.m. on May 20 he saw Mathews on his front porch and waved to him. He told Mathews he was going to work in 20 minutes and would be investigating a disturbance. Mathews said, "[D]oes this type of thing happen here all the time[?]" and asked Thibault if he needed help investigating the disturbance. Mathews was wearing a short-sleeved blue shirt and jeans.

Next, Richard Mierniczak, a Chicago police detective, testified that at 11:46 p.m. on May 20 he received a call to investigate a disturbance involving teens and drag racing at 130 Street and Avenue M. He and his partner, Officer Jeannie Hernandez, went to the site of the disturbance, a wooded area adjacent to Wolf Lake. Mierniczak stopped a black Pontiac that was speeding out of the woods. While he was talking to the occupants he saw Mathews walking on the sidewalk. At that time Mathews was wearing a multi-colored flannel shirt and jeans. Mathews asked Mierniczak if he needed any help, and Mierniczak said "no thank you, we're okay." As Mierniczak was leaving the area, he saw a yellow Oldsmobile and a gray Oldsmobile parked on a dirt access road that led out of the area.

Approximately 12:45 a.m., Mierniczak and Hernandez returned to the Wolf Lake area. At that time they noticed the yellow Oldsmobile they had seen earlier and saw a body lying next to the shoreline. Mierniczak approached the body and saw that it was male, but did not recognize the body as Mathews'. He saw that Mathews had a massive head injury and that his face was totally covered with blood. Miernic-

zak told Mathews he would be okay, that help was on the way, and asked him, "[W]ho did this?"

About 25 feet from the body he noticed bloodstains and a very large pool of blood, a concrete brick and a large rock which appeared to have on it human hair and part of a human skull. He also saw a baseball bat floating in the lake about 30 to 35 feet from the shore. On cross-examination he testified that the windshield of the yellow Oldsmobile was shattered and that the front tires were flat.

Next, Peter Wenzel testified that he lived at 13036 Avenue M across the street from Wolf Lake. At 11 p.m. on May 20 he heard the noise of traffic and people partying. He heard the police arrive and break up the party. Close to midnight, the party started up again. At around 12:30 a.m., he heard what sounded like a gunshot.

Timothy Gottardo testified that he lived at 13112 South Mackinaw Avenue. At 1 a.m. on May 21, he was out walking his dog. He saw Kennedy running south along the Conrail tracks. About a minute later, he saw four other men run by. He recognized three of them as Ed Manzo, Tony Chavez and Dean Chavez. The following morning he saw Kennedy with the police.

Next, Robert Baikie, a Chicago police evidence technician, testified that at 2 a.m. on May 22, he saw Mathews' body two to three feet from the water line at Wolf Lake. The area was wooded and the ground was soft and muddy. In the area he saw a bloody, concrete brick, and beer bottles and cans. He found a footwear impression in the ground and made a cast of it. He also found a knife and a revolver. He stated that the little finger of Mathews' right hand was missing. He did not dust the yellow Oldsmobile for fingerprints.

Edward Leracz, a Chicago police detective, testified that he went to Wolf Lake at 1:30 a.m. and saw Mathews' body lying near the water. He saw a yellow car parked close by the body, pulled a baseball bat out of the water, and took it to the evidence technicians. The next day, he returned to the area with Detectives McWeeny and Mark Hofer and defendant James Kennedy. Kennedy showed the detectives where they had buried Mathews' police star case wallet.

Next, Earl Zuelke, a Chicago police sergeant in the marine unit, testified that at 7 a.m. on May 21 he and Officers Zia, Spangnolo and Bahr went to the scene, searched Wolf Lake, and recovered a man's Timex wristwatch from the bottom of the lake, approximately 68 feet from the shore.

Kevin Bahr, a Chicago police officer in the marine unit, testified that he accompanied Sergeant Zuelke to Wolf Lake at 7:30 a.m. on

May 21 and found a tire iron at the bottom of the lake, 29 feet off shore.

Next, Daniel McWeeny testified that on May 21 he went to the home of Susan Miller at approximately 3:45 a.m. and saw Dean Chavez. At that time, he saw that Dean had a very large fresh wound on his right leg. He picked up some clothes from the floor and saw that they were torn, soiled and had red stains that appeared to be blood.

William Higgins, a Chicago police detective, testified that on May 22 at 2:40 a.m. he went to 3052 North Ashland and arrested Ralph Gabriel and Anthony Chavez. He took Anthony to police headquarters and read him his *Miranda* rights. Anthony stated that he was present at Wolf Lake when Mathews was killed. He admitted ownership of a pair of bloodstained blue jeans.

Next, Joan O'Brien, assistant State's Attorney, testified that on May 21 she interviewed Dean Chavez at police headquarters. She advised Dean of his *Miranda* rights and he said he understood them. Dean told O'Brien that he had been at a party at Wolf Lake with Anthony Chavez, Ralph Gabriel, Ed Manzo and James Kennedy. When the police broke up the party, everyone ran off. Shortly thereafter, Dean, Manzo and Kennedy returned to get Dean's car. They encountered Anthony and Gabriel, who said that someone was "messing with the car." Dean told O'Brien that someone asked him what he had in the trunk and he got out some baseball bats and a crowbar. Dean and Kennedy each took a bat, and Gabriel took the crowbar. The five men then went back to the area where Dean's car was parked and saw Mathews. Mathews had a gun in his hand and said "I am a police officer. Don't mess with me." Dean told O'Brien that Kennedy hit Mathews from behind in the back of the head, then Anthony and Gabriel wrestled Mathews to the ground to get him to drop the gun. Dean hit Mathews with the bat a couple of times in the back while Anthony had Mathews in a headlock. At some point, the gun went off, but no one was shot. Anthony picked up a rock and hit Mathews in the head several times. Dean told O'Brien that Manzo was there but did not hit Mathews. After that Dean ran into the woods and scratched his leg while jumping over a fence.

The parties then stipulated that Pamela Fish, a qualified expert in serology, would have testified that she analyzed Mathews' blood and the blood of Dean and Anthony Chavez. She performed serological tests on two pieces of wood found at the scene, on a baseball bat, a concrete brick, and a concrete rock, and determined that the blood on these objects matched the enzyme activity of Mathews' blood. She

also tested clothing belonging to Dean and determined that blood on the clothing matched Mathews' blood.

It was also stipulated that Bernadette Kwak, a qualified expert in the field of microscopic analysis of trace evidence, would have testified that she conducted an analysis on a pair of boots and found traces of glass, wood, silver and metal particles. She analyzed a folding knife which revealed the "minutest particle of a rubber-like substance." She also examined a man's Timex wrist watch and determined that the watch had been forcibly removed.

It was further stipulated that R.N. McCaster, a nurse at Cook County Cermak Hospital, would have testified that on May 23 she treated Anthony Chavez and determined that he had broken the third metatarsal bone in his left hand.

Next, Edward Manzo testified that at 7 p.m. on May 20, he went out with Dean Chavez. They drove around and got a case of beer in Indiana. Then they picked up Ralph Gabriel and James Kennedy and went to the Babe Ruth Little League field to listen to music and drink beer. Around 9:30 p.m. they drove around the neighborhood and encountered Anthony Chavez and his girl friend, Gloria Hunter. Anthony told Dean about a party at Wolf Lake, and they met there at 10:30 p.m. At 11 p.m. the police broke up the party and told everyone to leave. Manzo and the others hid in the woods. After the police left, everyone returned to the scene and continued drinking beer and listening to music.

Manzo said that at 11:50 p.m. the police came and again told everyone to leave. Again, Manzo and the others ran into the woods. When Manzo returned to the area, Anthony and Gabriel were not with the others. Manzo got in Dean's car with him, they picked up Gabriel, and drove off to find Anthony. They found Anthony at 130th and Carondolet talking on a pay telephone. They drove Anthony to his car.

Manzo, Kennedy and Dean waited in Dean's car for Anthony and Gabriel. Two minutes later, Anthony and Gabriel came back and told Dean "there's people fucking with Dad's car," and asked Dean if he had anything in the trunk. Dean got out two baseball bats and a tire iron. Dean kept one bat, gave a bat to Kennedy, and the tire iron to Anthony, and they went down the path to the car. Manzo saw Mathews walking towards them as they walked into the path. Anthony asked the man if he was the person that was "fucking with his car." Manzo said Mathews held a gun and stated "Don't fuck with the Police. I'm a policeman." Mathews was walking backwards and then Anthony grabbed him and threw a punch at him. At the same

time, Kennedy hit Mathews on the right side of his back with a baseball bat. They were all scuffling and fighting, while Mathews was trying to get away from them.

Manzo went to look at the car and saw that the windshield was broken and the tires were slashed. When he returned to the scene, he heard a gun discharge into the woods, and saw Anthony, Dean, Gabriel and Kennedy beating and kicking Mathews. At that time, Mathews had his hands over his head and he was gurgling and gasping for air. He did not have a gun in his hand.

Manzo said that Dean hit Mathews in the head with a concrete block. Then Anthony told Manzo to help look for the gun and to throw Mathews in the lake. They did not find the gun. Manzo, Dean and Kennedy picked up Mathews and moved him to the shore of the lake, about 40 feet away.

After they dropped Mathews' body, Dean picked up a baseball bat and said, "Do you still want to fuck with me[?] Well I'll show you," and hit Mathews five times in the head with the baseball bat.

Manzo stated that he then heard sirens and he ran back toward the woods. Gabriel ran to move the car. The five men met at the Conrail tracks and Anthony told Kennedy to get rid of Mathews' police star. Manzo and Anthony ran to Susan Miller's house, where they met Dean. Dean's father came and gave Anthony and Manzo a ride home. Anthony called Manzo at home 10 minutes later and told him not to say anything.

Manzo was charged with the murder of John Mathews. He agreed to plead guilty to the charge of concealing a murder and to testify against the others in exchange for two to four years of imprisonment. On cross-examination, Manzo stated that the murder charges against him had been dropped and that he had not yet pled guilty to concealing the murder. Manzo said he signed a written statement on May 21 which did not include his statement at trial that Dean hit Mathews with the bat. Manzo originally did not discuss Dean hitting Mathews because he was nervous and he did not think of it until later. On redirect, Manzo stated that Mathews had tried to walk away before the altercation began.

Next, Mitra Kalekar, the deputy Cook County medical examiner, testified that she performed a post-mortem examination on Mathews on May 21. The test showed that Mathews had multiple injuries about the head and face, and that the back of his head was shattered. She said that the large hole in the back of Mathews' head was consistent with being hit with a concrete block. She stated that the little finger on Mathews' left hand was severed and, in addition, he had five bro-

ken fingers on both hands. Kalekar stated that the cause of death was multiple injuries delivered by a blunt object. On cross-examination, she stated that Mathews received these wounds as he was attempting to defend himself and that he had no offensive wounds.

The parties stipulated that Laura Mathews would have testified that she was Mathews' wife, and would have identified the Timex watch as belonging to her husband. The parties also stipulated that Anthony was 23 years old and Dean was 20 years old at the time of the incident.

Following the State's case in chief, defendants' individual motions for judgment of acquittal on all counts were denied.

Anthony Chavez then testified on his own behalf that on May 20, he picked up Gloria Hunter and met Gabriel, Manzo and Kennedy at Wolf Lake. He stated that he consumed about 10 beers and was drunk. At about 11:45 p.m., he got into a verbal argument with Brian McInturf. As they were yelling at each other, the police arrived and told everyone to leave the park. Anthony left his car and ran through the woods to a pay phone at 130th and Carondolet. He called his father and asked him to pick him up. At that time, Dean drove by and gave Anthony a ride. They drove back to the lake, and Anthony and Gabriel got out of the car and walked back along the dirt road to get the car. Anthony heard air deflating from tires, so he hid in the bushes. He saw a man pull a knife out of the tires and kick in the windshield. Anthony told Gabriel to watch the car while he went to get the others. He told Dean that there were "some people messing with the car" and Dean got two baseball bats and a tire iron out of the trunk. They all ran back to the car.

Anthony confronted Mathews and asked him "why the hell he was messing up my car," and Mathews pulled out a gun and said "don't fuck with me." Anthony took a step back and dropped the tire iron. Then, Kennedy struck Mathews from behind. Anthony grabbed Mathews' arm to get his gun and the gun went off four inches away from him. They struggled as Mathews kept trying to get away.

On cross-examination, Anthony stated that Dean hit Mathews on his back more than once. He originally thought Mathews might have been Brian McInturf. While he was looking for the gun, he found Mathews' wallet and gave it to Kennedy. He denied telling Gloria Hunter that Kennedy hit a police officer and that he had used a brick to hit Mathews.

Dean Chavez also testified on his own behalf. He testified to the same essential facts as described by Anthony. He denied throwing a rock at Mathews. When he saw a police car coming he ran into the

woods and cut his leg when he hopped over a fence. He dropped the bat and left it where he fell, got up and ran to Susan Miller's home. He denied hitting Mathews repeatedly with a baseball bat after Mathews' body was moved to the edge of the lake.

On rebuttal, the State called several witnesses. Gloria Hunter testified that when she saw Anthony at 1 a.m., he told her that Mathews had ordered them to stand back and that he was a police officer. Anthony told her that they had beaten Mathews with baseball bats, a brick and a tire iron. On cross-examination, she stated that the police had informed her of the consequences of aiding and abetting a felon. She said that Anthony's head was bleeding and that his hand was swollen. The next day, it was confirmed to Anthony that Mathews was a police officer.

Officer McWeeny testified that he did not tell Dean to say anything to the assistant State's Attorney. He also said that the first time he talked with Dean, Dean was reluctant to incriminate his family and that he was emotional, but that he had calmed down by his second interview.

Assistant State's Attorney O'Brien testified that when she interviewed Dean, he was calm and relaxed. She said that Dean told her that Mathews immediately identified himself as a police officer at the time of the incident.

Following closing arguments, the trial court found Dean and Anthony Chavez guilty of second degree murder. After a hearing in aggravation and mitigation, the trial court sentenced each defendant to extended prison terms of 27 years. Defendants' timely appeals followed.

## Opinion

Initially, defendant Dean Chavez (hereinafter Dean) contends that the trial court erred in denying his pretrial motions to quash arrest and suppress oral statements made after arrest on the grounds that the police had neither consent to search the home of Mrs. Miller nor probable cause to arrest Dean in the Miller home. In response, the State argues that police officers entered the Miller home with Mrs. Miller's consent and had probable cause to arrest Dean when they saw the fresh wound on his leg and his muddy, bloodstained clothes on the floor.

A trial court's finding on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 399, 495 N.E.2d 984; *People v. Brett* (1984), 122 Ill. App. 3d 191, 460 N.E.2d 876.) Whether consent to search was vol-

untary is a question for the trier of fact to be determined from the totality of the circumstances (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-49, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059), and will not be set aside unless it is clearly erroneous. *People v. McNair* (1983), 113 Ill. App. 3d 8, 446 N.E.2d 577, *cert. denied* (1983), 464 U.S. 860, 78 L. Ed. 2d 164, 104 S. Ct. 185.

The cases relied on by Dean, *People v. Johnson* (1981), 99 Ill. App. 3d 863, 425 N.E.2d 1215 (opening the door in response to the officer's statement that he was there to make an arrest was merely acquiescence to authority), *People v. Montgomery* (1980), 84 Ill. App. 3d 695, 405 N.E.2d 1275 (no consent where the door was opened after police knocked and immediately arrested defendant who stood in hallway), and *People v. Householder* (1980), 81 Ill. App. 3d 31, 400 N.E.2d 988 (consent to enter not voluntary where defendant blocked the door to stop the officer from entering his apartment), are factually distinguishable from the present case and therefore unpersuasive.

In the present case Mrs. Miller testified that she was awakened by police officers ringing her doorbell and knocking on her door. She opened the door, let the officers in and Officer McWeeny asked her if he could talk to her daughter, Susan Miller. Mrs. Miller went to Susan's bedroom door, knocked, and told Susan to open the door.

Detective McWeeny testified that he and several other detectives went to the Miller home at 3:45 a.m. on May 21. Mrs. Miller answered the door, asked him to identify himself and then said "Why don't you come in." He explained that he needed to talk to Susan. Mrs. Miller then went to Susan's door and knocked. When there was no response, she tried the door, but it was locked. Mrs. Miller continued to ask Susan to open the door when Susan's sister Debra appeared and knocked on the door, telling Susan to open the door. At that point Detective McWeeny said to Mrs. Miller, "Why don't you let me try" and knocked on the door. Susan then opened the door. Based on the record, defendant has failed to show that the the officers lacked consent to enter the Miller home.

Dean argues, in the alternative, that even if Mrs. Miller consented to entry into the Miller home, consent was not granted for entry into Susan Miller's locked bedroom. Dean contends that he had an expectation of privacy in the bedroom of Susan Miller because he had keys to the house and stayed overnight there on occasion.

Under the common authority test used by Illinois courts, third parties may give consent for search of another's premises if they generally have joint access or control over searched premises. (*People v. Howard* (1984), 121 Ill. App. 3d 938, 460 N.E.2d 432; *United States v.*

*Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993.) In cases in which it is established that defendant resides with parents or close relatives, and the parents or relatives consent to a search of defendant's bedroom, it should be presumed that there is a common authority over the bedroom sufficient to authorize the consent to search. (*Howard*, 121 Ill. App. 3d at 947.) Lack of common authority can be rebutted with evidence that the child/relative has established exclusive possession of the searched premises, *e.g.*, whether the room is locked and whether the child/relative gave specific instructions not to enter the room. *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24.

Dean's reliance on *People v. Rodgers* (1981), 96 Ill. App. 3d 416, 421 N.E.2d 203, is misplaced. In *Rodgers*, the police arrived at the home of defendant to investigate an assault that had occurred in the living room of defendant's home. Finding no evidence after a general survey of the home, the police engaged in an exhaustive search without consent or a search warrant and found controlled substances. The court held that the police had no authority to conduct the exhaustive search because they had no information about the crime they were investigating. *Rodgers*, 96 Ill. App. 3d at 417-18, 421 N.E.2d at 205.

The record in the present case does not disclose a fact situation similar to *Rodgers*. Dean was not found in his own home, but in the home of a third party. In the present case, the record discloses that Susan was a 17-year-old high school student who lived with her mother. She allowed her mother to clean her room and never gave her mother specific instructions not to enter the room. Based on the record, Dean has failed to rebut the presumption that Mrs. Miller had the authority to consent to entry into Susan's bedroom.

■ Dean also argues that McWeeny did not have consent to turn on the bedroom light and, therefore, using the light constituted an illegal search. Dean's argument is without merit. The use of artificial means to illuminate a darkened area simply does not constitute a search and thus triggers no fourth amendment protection. *Texas v. Brown* (1983), 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535; *United States v. Lee* (1927), 274 U.S. 559, 563, 71 L. Ed. 1202, 1204, 47 S. Ct. 746, 748 ("[The] use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution"); *United States v. Hanahan* (7th Cir. 1971), 442 F.2d 649 (shining a flashlight through the window of a dark garage does not constitute an illegal search).

■ Next, Dean argues that police lacked probable cause to arrest him. The fourth amendment of the United States Constitution re-

quires that probable cause exist to arrest a person. (U.S. Const., amend. IV.) Probable cause exists when the totality of the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been committed and that the person arrested has committed the offense. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475; *People v. Moody* (1983), 94 Ill. 2d 1, 445 N.E.2d 278.) A trial court's denial of a motion to quash arrest will not be disturbed on review unless it is manifestly erroneous. *Stachelek*, 145 Ill. App. 3d at 399.

In the present case, McWeeny simultaneously saw the fresh wound on Dean's leg and, as he was picking up Dean's clothes to hand to him, noticed that the clothes were ripped and stained with mud and blood. The record discloses that McWeeny knew that the ground at the crime scene was soft and muddy, that there was a large amount of blood throughout the site, that there had been an altercation, and that the perpetrators had fled the scene.

Dean further argues that Detective McWeeny's handling of Dean's pants constituted an illegal seizure. The State responds that the handling of the pants was proper under the plain view doctrine.

The plain view doctrine allows a police officer to seize an item when (1) the officer is lawfully located in the place where he observed the object, (2) the object is in plain view, and (3) the item's incriminating nature is "immediately apparent." (*Horton v. California* (1990), 496 U.S. 128, 110 L. Ed. 2d 112, 110 S. Ct. 2301; *People v. Testa* (1984), 125 Ill. App. 3d 1039, 1043, 466 N.E.2d 1126.) The *Testa* court held that seizure was proper under the plain view doctrine where arresting officers testified that clothing was in plain view when they entered the bedroom of a defendant pursuant to his arrest, officers had a right to be in the bedroom, and officers observed long blond hairs on one of the shirts after the victim told officers that her attacker wore similar clothing and had pulled hair from her head. *Testa*, 125 Ill. App. 3d at 1042-43.

The record in the present case indicates that Officer McWeeny saw the stained pants on the floor when he entered the bedroom. In addition, McWeeny was present with the consent of Mrs. Miller, and he knew that the ground at the crime scene was muddy and bloody.

Finally, Dean argues that the trial court erred in failing to suppress his oral statement made at police headquarters following his arrest because the police lacked probable cause to arrest him. Based on the facts and circumstances of this case, the record supports the ruling of the trial court that there was voluntary consent to enter the

Miller home and probable cause to arrest Dean, and it follows that its ruling was not manifestly erroneous. (*Stachelek*, 145 Ill. App. 3d at 399.) Thus, the trial court properly denied Dean's motion to quash arrest and suppress his statements.

Next, both Dean and Anthony contend that the evidence in this case is insufficient to support convictions of second degree murder. Defendants contend their convictions for murder were unjust because they acted in self-defense, *i.e.*, with lawful justification. The State responds that the evidence refuted defendants' claim of self-defense.

A criminal conviction will not be set aside unless the evidence is so improbable or so unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) In reviewing a defendant's challenge to the sufficiency of the evidence, the court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.

In Illinois, a person commits second degree murder when he commits the offense of first degree murder and either of two mitigating factors is present. The statutory factor applicable in the present case is that, at the time of the killing, the defendant believed the circumstances to be such that they would justify the killing on self-defense grounds, but his belief was unreasonable. *People v. Bosek* (1991), 210 Ill. App. 3d 573, 594, 569 N.E.2d 551; Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a).

Whether the person has acted in self-defense depends upon the surrounding facts and circumstances and is a question for the trier of fact. (*Bosek*, 210 Ill. App. 3d at 596.) It is axiomatic that determinations of the credibility of witnesses and the weight to be given to their testimony are the function of the trier of fact. The affirmative defense of self-defense is raised only if defendant presents some evidence as to each of the following elements of the defense: (1) force had been threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm is imminent; (4) the force threatened was unlawful; (5) defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force he used was necessary; and (6) that the beliefs were reasonable. (*People v. Kyles* (1980), 91 Ill. App. 3d 1019, 415 N.E.2d 499.) Once defendant has presented some evidence as to each of these elements, the State has the burden of disproving the defense beyond a reasonable doubt. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275.) If the State negates any one of the self-defense elements beyond

a reasonable doubt, it has met its burden of proof. (*People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290.) The issue of self-defense is one of fact. Therefore, it is the function of the trier of fact to resolve any conflicts in the evidence and to determine credibility of the witnesses. (*People v. Perry* (1980), 91 Ill. App. 3d 988, 415 N.E.2d 523.) On review, the decision of the trier of fact will not be disturbed unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. *Zolidis*, 115 Ill. App. 3d at 674.

▇ In the present case, the State has proved beyond a reasonable doubt that defendants did not act in self-defense. While the trial court found defendants initially armed themselves in self-defense because they believed Mathews was "criminally damaging their father's car," the record shows that their subsequent actions were not taken in self-defense. The record indicates that defendants were two of five men who encountered Mathews at Wolf Lake on the night of the incident. Edward Manzo, one of the five men, testified that Mathews waved a gun at all of them, but continuously backed away from all of them telling them not to "mess with him." Manzo testified that defendant James Kennedy struck Mathews first. Anthony and Ralph Gabriel wrestled Mathews to the ground and tried to get his gun while Dean hit Mathews with a baseball bat. Dean threw a concrete block at Mathews which hit him in the head. During the incident Mathews had his hands over his head to protect his head and continued to try to get away from defendants. Once Mathews was disarmed and on the ground gurgling and gasping for air, Anthony instructed the others to throw Mathews in the lake.

Defendants' testimony conflicts with Manzo's, but where testimony is merely conflicting, a reviewing court will not substitute its judgment for that of the trial court. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) Moreover, self-defense is no justification for the use of deadly force once the antagonist has been subdued or is lying helpless on the ground. (*People v. Berry* (1988), 175 Ill. App. 3d 420, 529 N.E.2d 1001.) Keeping in mind that it is the trier of fact's task to determine the credibility of witnesses and the weight to be accorded their testimony (*People v. Florey* (1987), 153 Ill. App. 3d 530, 505 N.E.2d 1096), and noting the fact that Mathews' skull was crushed, his finger was severed and he had many broken bones, the record clearly supports the fact finder's conclusion that defendants did not justifiably act in self-defense. *Berry*, 175 Ill. App. 3d at 426.

Next, Dean and Anthony each contend that the trial court erred in finding them guilty of second degree murder on an accountability

theory. Pursuant to section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c)):

> "A person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Dean contends that if the others acted excessively, there is no evidence that he aided or abetted in that action, and thus, he cannot be held responsible for the acts of the others present. In the alternative, Dean persists in the argument that he acted in self-defense, and in support offers the fact that he hit his own brother, Anthony, during the struggle breaking Anthony's hand. Dean further argues that Edward Manzo was not a credible witness because his testimony at trial was impeached by his own prior out of court statement. In response, the State argues that the evidence at trial overwhelmingly supported Dean's conviction on an accountability theory.

The intent to promote or to facilitate a crime can be inferred from the surrounding circumstances. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.) The testimony of a single eyewitness is sufficient to support a conviction, provided that the witness is credible and the circumstances were such that would permit a positive identification. (*People v. Nightengale* (1988), 168 Ill. App. 3d 968, 523 N.E.2d 136.) It is the function of the trier of fact to determine the credibility of the witnesses and the weight to be afforded their testimony, and the trier of fact may reject defendant's explanations and accept the prosecutor's evidence as true. *People v. Burke* (1985), 136 Ill. App. 3d 593, 483 N.E.2d 674.

In the present case, the surrounding circumstances demonstrate Dean's guilt of second degree murder on the accountability theory beyond a reasonable doubt. As was previously stated, Manzo testified that Anthony threw a punch at Mathews and wrestled him to the ground while Dean hit Mathews with a baseball bat. Dean threw a concrete block at Mathews' head. After Mathews was no longer moving, Dean, Manzo and Kennedy picked up Mathews' body and moved him to the lake. When defendants and the others heard police sirens, they ran away.

Regarding Anthony's contention that he is not liable on an accountability theory, Anthony argues that there is no evidence that he ever hit Mathews after the initial incident, where he wrestled him to

the ground, nor is there evidence that he aided and abetted the others in hitting Mathews. Anthony claims he only had Mathews moved to find the gun, and that was for the purpose of self-defense. In response, the State argues that the facts clearly establish Anthony's accountability for second degree murder.

When finding a party guilty under an accountability theory, the criminal acts committed do not have to result from a preconceived plan, provided the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. (*People v. Hudson* (1988), 165 Ill. App. 3d 375, 378, 519 N.E.2d 28.) While mere presence at the scene or mere acquiescence in another's actions is ordinarily insufficient to establish accountability, one may be held to aid and abet without physically participating in the overt act. (*People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 655, 493 N.E.2d 135.) If the evidence shows that defendant was present at the scene of the offense without disapproving or opposing it, the trier of fact may consider this conduct along with other circumstances in determining whether defendant assented to the commission of the offense and thereby aided and abetted the actor. (*Miscichowski*, 143 Ill. App. 3d at 656; *People v. Young* (1983), 116 Ill. App. 3d 984, 452 N.E.2d 718.) Similarly, failure to report the incident is relevant to establishing accountability. (*Young*, 116 Ill. App. 3d at 994; *People v. Watson* (1982), 106 Ill. App. 3d 315, 436 N.E.2d 7.) Defendant's flight from the scene may also be considered. *Miscichowski*, 143 Ill. App. 3d at 656.

The evidence in the present case shows that Anthony was present during the entire incident, that he wrestled Mathews to the ground, and that he later directed Kennedy to take Mathews' police star and Manzo to move Mathews' unconscious body to the lake. The evidence also shows that Anthony fled the scene of the crime and that later that night he told Manzo not to say anything to the authorities. There is no evidence that Anthony attempted to disassociate himself from the others, or that Anthony exhibited opposition or disapproval of the actions of the others during the incident. This evidence was sufficient to support both Dean's and Anthony's convictions on a theory of accountability.

Next, Dean and Anthony each contend that the trial court erred in sentencing them to extended terms of 27 years for second degree murder. The sentencing decision of a trial court is entitled to great deference and weight (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344), and absent an abuse of discretion by the trial court, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) An appellate court will not substitute

its judgment for that of the trial court merely because it would have balanced the appropriate factors differently had it been charged with the task of sentencing (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541), especially where the sentence imposed by the trial court is within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.

Second degree murder is a Class 1 felony, punishable by not less than four years but not more than 15 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(4).) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by section 5—8—1 unless the factors in aggravation set forth in section 5—5—3.2(b) are found to be present. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a).) Where the judge finds such factors present, he may sentence an offender to an extended term of between 15 and 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(3).) The presence of one of the statutory factors in section 5—5—3.2(b) will suffice for the imposition of an extended-term sentence. Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b); *People v. Woods* (1984), 122 Ill. App. 3d 176, 182, 460 N.E.2d 880, 885.

Defendants argue that their sentences should be reduced to 10 years because Ralph Gabriel received a 10-year sentence on his conviction for second degree murder.[2] Disparity between sentences will not be disturbed where it is warranted by differences in the codefendants' criminal records, their rehabilitative potential, or the nature and extent of their participation in the offenses. *People v. Dixon* (1985), 133 Ill. App. 3d 1073, 480 N.E.2d 128.

In the present case, the record shows that the court considered that Gabriel kicked Mathews several times. The record shows that Dean hit Mathews with a baseball bat while he was attempting to flee, and that both defendants beat Mathews while he was gurgling and gasping for air. Dean threw a concrete block at Mathews' head, the impact of which shattered Mathews' skull.

The record in this case indicates that defendants were sentenced to 27 years' imprisonment, which is well within the statutory guidelines for an extended term for a Class 1 felony such as second degree murder. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(3) (for a Class 1 felony, a term shall be not less than 15 years and not more than 30 years).) The court found defendants' conduct to be brutal and

---

[2]Ralph Gabriel's conviction and sentence were affirmed in a Rule 23 order (*People v. Gabriel* (1st Dist. 1990), No. 1—89—2583).

heinous and "one of the most brutal and vicious attacks ever presented before this court." The record also shows that the trial court considered various factors necessary to determine appropriate sentences, including appropriate sentencing range, rehabilitation, and prior criminal record. The record indicates that the court considered that Dean is a high school graduate and held two jobs, that he engaged in athletics and that he had no prior criminal record, and that Anthony finished high school, served in the army, received an honorable discharge, was employed for two years, and had no prior criminal record. Based on these facts, defendants have failed to show that the trial court erred in sentencing.

▇▇ Dean and Anthony next contend that an extended-term sentence is inconsistent with a conviction for second degree murder.

Defendants rely on *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520. But, in a recent case, this court found *Evans* to be unpersuasive as authority for defendants' proposition. (*People v. Pirrello* (1991), 207 Ill. App. 3d 208, 565 N.E.2d 324; see also *People v. Lindsay* (1990), 193 Ill. App. 3d 983, 550 N.E.2d 719 (19-year extended-term sentence for second degree murder upheld).) Extended term is therefore consistent with a conviction on second degree murder.

▇▇ Finally, Anthony and Dean contend that section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2)) is vague and violative of the eighth amendment prohibition against cruel and unusual punishment. This argument has been rejected repeatedly (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499-500, 431 N.E.2d 344; *People v. Peeples* (1989), 184 Ill. App. 3d 206, 212, 539 N.E.2d 1376; *People v. Cooper* (1985), 136 Ill. App. 3d 517, 528, 483 N.E.2d 309; *People v. Sanford* (1983), 116 Ill. App. 3d 834, 844, 452 N.E.2d 710), and we do the same.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed as modified.

O'CONNOR and MANNING, JJ., concur.