THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDDIE ALVAREZ, Defendant-Appellant.

First District (2nd Division)   No. 1—87—1164

Opinion filed June 6, 1989.—Rehearing denied August 16, 1989.

542

Michael J. Pelletier, Martin Carlson, and Timothy T. McLaughlin, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and William B. Schiller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant appeals his conviction for murder and his sentence of 50 years' imprisonment, raising the following issues: (1) whether the trial court erred in admitting into evidence the victim's statement identifying defendant as his assailant; (2) whether the trial court abused its discretion in denying defendant's motions for a mistrial; (3) whether defendant was denied a fair trial by the prosecutor's statements during opening and closing arguments; (4) whether it was plain error for the trial court not to instruct the jury on voluntary manslaughter; and (5) whether the trial court abused its discretion in sentencing defendant to an extended term.

Defendant was charged with three counts of murder and one count of home invasion. At a pretrial hearing held after defendant objected to the State's use of a police officer's testimony that the victim had identified him, Chicago police officer Michael Fuith testified that on September 7, 1985, at 3:50 a.m., he and his partner responded to a call that a man had been stabbed at 1426 West Leland in Chicago. When they arrived at the scene, a group of people was supporting the victim, Donald Curry, who was bleeding profusely from the upper part of his body. Fuith stated that the victim was "angry and excited," and that he identified defendant as his attacker. The other people present also indicated that defendant was the assailant. The police then transported the victim to the hospital, and on the way there the victim again stated that defendant had stabbed him "over a woman." In the emergency room the victim continued to implicate defendant. On cross-examination, Fuith admitted that his reports do not make reference to having any conversations with defendant at the scene, in the police car or at the hospital. He claimed to have related these conversations to a detective, but there is no reference to the victim's statements in the detective's report. The trial judge ruled that he would not allow the victim's statements in as dying declarations, but would admit them as excited utterances. He made a finding that there was an occurrence sufficiently startling to produce a spontaneous declaration, an absence of time to fabricate, and that the officer's question of what had happened did not destroy the spontaneity of the declaration. The following day, prior to trial, the judge *sua sponte* modified his ruling to allow the State to present testimony as to only one of the victim's statements identifying defendant, stating that "if one repeats the statement numerous times, it at some point becomes no longer a spontaneous declaration." He allowed the State to choose which of the victim's statements it would use, either that made when the police first arrived at the scene or his statement while being transported in

the police car to the hospital.

At trial, Debra Carroll testified that she lived in a second-floor apartment at 1426 West Leland with her common law husband, Fred Hakanson, and their children. Fred's brother Eric also resided in the apartment at the time of the stabbing. Carroll knew everyone involved in the occurrence. Elizabeth Bradley, a friend of Carroll's, had been dating the victim for about two weeks, and defendant was "Bradley's live-in boyfriend." At approximately 3:30 a.m., on September 7, 1985, Bradley and the victim arrived at Carroll's apartment. Carroll was asleep, but she heard Eric Hakanson, who was sleeping on a couch in the living room, answer the doorbell and she also heard the victim say "It is me, Don," as he entered the apartment. Carroll remained in bed, and although she heard Eric lay on the couch, she did not know what the victim did or where he went in the apartment. Approximately 10 minutes later, Carroll heard "a shuffling noise" and she walked into the living room. There, she saw defendant bent over Bradley and the victim, who were lying on the floor, pulling a knife out of the victim's chest. Carroll exclaimed "Oh, my God," and defendant turned around, looked at her, then ran towards the back door. Carroll followed him to the back porch and watched him run through a gangway and into an alley. Carroll returned inside to alert the others that defendant was in the alley, then she grabbed a baseball bat and ran down the back stairs to the second-floor landing, where she encountered defendant. They struggled, and then defendant ran back into the gangway and into the alley. By the time she returned to her apartment, Fred and Eric had already helped the victim down to the front of the building. Approximately an hour later, she telephoned Fred at the hospital to tell him that defendant was standing across the street from their building. Upon Fred's return a short time later, Carroll saw defendant motion "come on, come on" to Fred, who started to chase him. She later learned that defendant had been arrested. The victim died three days later.

On cross-examination, Carroll testified that when she heard the "shuffling" she did not hear yelling or things getting knocked over, and, although her two Labrador dogs were in the living room, they did not bark.

Officer Fuith testified that he and his partner transported the victim to the hospital, and on the way the victim kept repeating, "fucking Alvarez, he stabbed me, he fucking stabbed me over a woman," and that "I was going out with his girl friend and he couldn't handle it and the jealous little prick, he couldn't handle it." Additionally, Fuith stated that the victim indicated that defendant had stabbed him

"in the apartment where he had been staying." Fuith also testified that he had conversations with Fred, Eric and Bradley, both at the scene and at the hospital, and that after these conversations he sent a radio broadcast into his district to look for defendant. Defendant was apprehended later in the morning of September 7, 1985, after being chased by police.

Dr. Edmund Donoghue testified that he performed an autopsy on the victim, which revealed that he had suffered a deep stab wound to the upper left lobe of the lung, between the second and third ribs, a stab to the left lower lobe of the lung, a stab wound to the upper abdomen which perforated the left lobe of the liver, and superficial stab wounds to the chest, armpit and left arm, as well as various bruises and abrasions. He gave his opinion that the victim died of multiple stab wounds, and he disagreed with defense counsel's suggestion that he died from liver failure and renal failure.

Dr. Michael Friedberg, the victim's treating physician, testified that, but for his cirrhosis of the liver and portal hypertension, the victim would not have died from his stab wounds; on cross-examination, he stated that without the stab wounds, the victim would not have died when he did.

The jury found defendant guilty of murder, and the trial court directed a verdict in favor of defendant on the home invasion charge. After hearing factors in aggravation and mitigation, the trial judge sentenced defendant to an extended term of 50 years' imprisonment, finding that the crime was "accompanied by exceptionally brutal and heinous behavior." He now appeals his conviction and sentence.

OPINION

Defendant first argues that the trial court erred in allowing Officer Fuith to testify regarding the victim's statements identifying him as his assailant. He contends that Fuith's testimony is "devoid of all credibility," because there was nothing in his reports concerning the victim's statements, and thus he was relying on his memory alone to relate statements made a year previously. The State correctly responds that the trial judge had an opportunity to view the witness and weigh his credibility, and it is not unreasonable to believe that Fuith remembered what a severely wounded and bleeding man had said as he was transported to the hospital. Moreover, at trial the jury was told that there was nothing in Fuith's reports regarding the victim's statements, and thus they knew he was relying on his memory when they weighed his credibility.

■ The victim's statements were admitted under the spontaneous

declaration exception to the hearsay rule. In order to bring a statement within that exception, the following elements must be present: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) the statement must relate to the circumstances of the case. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.) The spontaneity of a statement is to be judged from the totality of the circumstances surrounding the event (*People v. Smith* (1984), 127 Ill. App. 3d 622, 469 N.E.2d 634), the evidence must indicate that the declarant personally observed the matters which are the subject of the spontaneous declaration (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804), and the declarant must be deemed reliable. *People v. Miller* (1978), 58 Ill. App. 3d 156, 373 N.E.2d 1077.

Defendant contends that there was an absence of evidence to support the inference that the victim had an opportunity to perceive and identify his assailant and thus his statements should not have been admitted. He asserts that there is no indication that the victim was awake when he was attacked, and, in fact, it was more than likely that he was asleep. He emphasizes that the victim was lying on the floor, everything was quiet, no one yelled or screamed, nothing was knocked over, and the dogs did not bark. He maintains that the evidence indicates that it is probable that the victim did not see his attacker and that he identified defendant based on the statements of other people.

The State responds that the claim that the victim slept through his own stabbing is "without merit," yet it argues that the murder was exceptionally brutal and heinous because defendant attacked a sleeping man. The State may be seen to resolve this apparent contradiction by arguing that the victim awoke during the attack; however, it fails to make its position clear in its brief. The State notes that the victim positively identified defendant and that he understood that defendant attacked him because of his relationship with Bradley. It argues that his identification is reliable and satisfies the spontaneous declaration exception, hence it was properly admitted.

■ The jury took into consideration the testimony that no one screamed or knocked over anything and that the dogs did not bark, and it accepted the victim's statements as truthful. The statements were admissible as spontaneous declarations, and the circumstances surrounding them go to the weight given them by the jury. We find no error in the trial court's rulings on the issues raised by defendant on this aspect of his case.

Defendant next argues that the trial court abused its discretion in

denying his motions for a mistrial. Although defendant made several such motions, he raises the denial of only three of them in this appeal. He contends that testimony from witnesses not present at trial was admitted, thereby denying him his right to a fair trial and to confront his accusers.

Fred Hakanson testified that he and his brother looked for defendant after returning from the hospital on September 7, 1985. The prosecutor then asked the following questions:

"Q. Mr. Hakanson, Eric was with you the entire time you were looking for the defendant, is that correct?

A. Yes, ma'am.

Q. And he was also with you when you talked to the police, isn't that correct?

A. Yes.

Q. And Eric told the police—

[DEFENSE COUNSEL]: Objection to what Eric told the police. They know better than that.

THE COURT: Objection sustained. I will ask the jury to disregard that.

Q. Mr. Hakanson, the only person that the police were looking for was Eddie Alvarez, is that correct?

A. Yes.

Q. Eric told the police that he ran from the apartment that night, didn't he?

[DEFENSE COUNSEL]: Objection, Judge.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I have a motion."

The judge denied defendant's motion for a mistrial, stating:

"Counsel, your motion for a mistrial, at this point, is inappropriate.

The Court agrees, it was improper to ask those questions. I would advise the State's Attorney not to do so again. However, I will respectfully deny your motion for a mistrial. I have ordered the jury to disregard that. I feel that satisfies the point."

The State then called Officer Fuith, who testified that he had conversations with Bradley, Fred and Eric at the hospital, and that after talking with these witnesses and the victim, he put out a transmission for his police district. Defense counsel objected, arguing that it was "hearsay by implication" to allow Fuith to give the impression that "all four of these individuals *** have said to [him] it was Eddie Alvarez." He then made a motion for a mistrial, which the judge denied, stating that Fuith had a right to explain his investigation. The judge

offered to instruct the jury, but defense counsel replied:

"I don't believe that will correct the problem we have here. I move for a mistrial. I did [*sic*] not want the Court to make any further attempts—I'm hoping that may be the jury will forget.

I understand the limits. The Court wants to give the instruction to the jury and I don't believe that would solve this problem. And I don't want to bring any more attention to the question."

Fuith continued testifying that he sent a broadcast to his district; that after leaving the hospital he and his partner continued to search for the offender; and that they knew they were looking for defendant.

Finally, during rebuttal arguments, the prosecutor stated:

"They all named Eddie Alvarez from the get go, that's the man they knew in their living room and every witness said the same thing.

[DEFENSE COUNSEL]: Objection, Judge. This was talked about at sidebar[,] what all the witnesses said.

THE COURT: Again, counsel refers to the witnesses that testified. You may continue.

[THE PROSECUTOR]: Witnesses that testified told you what happened. You know the other witnesses were present when the police were beginning their investigation and you know how they responded.

[DEFENSE COUNSEL]: Objection, Judge.

THE COURT: I'd sustain the objection. Ladies and gentlemen, you may only consider the testimony of the witnesses that actually testified here in court.

[DEFENSE COUNSEL]: I will make a motion at the end."

The judge once again denied defendant's motion for a mistrial, stating:

"The Court has admonished the jury both at the time of the objection and at the conclusion of all the arguments. I further advised them they should not consider or conjecture as to what any other witness that did not testify might have said. Therefore, in my humble judgment, I feel that that would rectify whatever you think may have happened."

Defendant argues that the only evidence against him was the identification by Carroll and the "questionable excited utterance of the victim." He claims that the effect of the testimony and arguments cited above was to improperly corroborate Carroll's testimony, and that there was no way for the trial court to "remove the damaging evidence from consideration by the jury."

The State responds that there was overwhelming evidence of defendant's guilt, and therefore any allegedly improper comments could not have influenced the jury or prejudiced defendant. Further, the State argues, the trial court admonished the jury during and after trial to consider only testimony of the witnesses that testified at trial, thus curing any error.

■ The decision whether to grant a mistrial is within the discretion of the trial court (*People v. Watson* (1982), 103 Ill. App. 3d 992, 431 N.E.2d 1350), and such a determination will not be reversed unless it appears that there was a manifest necessity for a mistrial or that the ends of justice would be affected by continuing with the trial. (*People v. Roberts* (1980), 83 Ill. App. 3d 311, 404 N.E.2d 278.) It must appear that the jury has been so influenced and prejudiced that it cannot be fair and impartial (*People v. Rose* (1979), 77 Ill. App. 3d 330, 395 N.E.2d 1081), and that the damaging effect on the jury cannot be removed by admonitions or instructions. *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.

■ In the instant case, the evidence of defendant's guilt is exceedingly strong. Both Carroll and the victim positively identified defendant as the assailant, there was testimony that defendant fled when chased by the Hakansons and the police, as well as testimony regarding defendant's motive. The judge instructed the jury to consider only proper evidence, of which there was enough to support their verdict. Thus, even if the State improperly led the jury to believe that Bradley and Eric Hakanson had identified defendant, that would not be a basis for reversing his conviction.

Defendant next argues that the trial court erred in failing to instruct the jury on voluntary manslaughter. Neither party cites *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, to this court, although that decision was filed long before the State filed its response and defendant filed his reply brief.

In *Reddick*, the court addressed the issue:

"When a defendant charged with murder asserts that the killing (if unjustified) is at most voluntary manslaughter because either (a) he acted in the unreasonable belief that the killing was justified or (b) he acted under a sudden and intense passion caused by adequate provocation [citation], who bears the burden of proof on these issues and what is the extent of the burden?" (123 Ill. 2d at 193.)

The court held:

"[I]f a defendant in a murder trial presents sufficient evidence to raise issues which would reduce the charge of murder

to voluntary manslaughter, then to sustain the murder conviction, the People must prove beyond a reasonable doubt that those defenses are meritless, and must also prove beyond a reasonable doubt the statutory elements of murder.

The burden-of-proof instructions regarding both voluntary manslaughter and murder *** were thus incorrect in placing upon the People the burden of proving the existence of intense passion or unreasonable belief in justification. The instructions should have placed upon the People the burden of disproving the existence of either of these two states of mind." (123 Ill. 2d at 197.)

The court considered the burden-of-proof instructions even though defendants in that consolidated appeal had not objected to the instructions as given, presented new ones at trial, or raised the issue in their post-trial motions. The court stated that "instructions *** [on] the burden of proof and elements of the offense, are essential to a fair trial and *** the failure to give such instructions constitutes grave error when, viewing the record as a whole, it appears that the jury was not apprised of the People's burden of proof." 123 Ill. 2d at 198.

In the instant case, defense counsel admitted during the sentencing hearing that, although the victim was lying on the floor next to defendant's girl friend, "[it] wasn't even argued that that was a justification for the stabbing." However, there was testimony that the victim dated Bradley while she lived with defendant and that he was killed while lying next to her on the floor. During the sentencing hearing, the judge stated, "I am mindful there was a passion involved." *Reddick* held that it was "grave error" not to properly instruct the jury in a murder case that the State had the burden to disprove that defendant acted under a sudden and intense passion when defendant has presented sufficient evidence to raise the issue. However, we do not believe that *Reddick* is controlling in this case, because defendant never argued that he acted under such a passion.

Defendant cites a number of cases in support of his contention that an instruction on voluntary manslaughter should have been given in his case (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358; *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756; *People v. Moore* (1980), 89 Ill. App. 3d 202, 411 N.E.2d 579; *People v. Winters* (1978), 56 Ill. App. 3d 500, 371 N.E.2d 1226); however, none of these cases involved a situation similar to the case at bar, where defendant did not argue that he had killed as a result of passion and did not request a voluntary manslaughter instruction.

The State argues that when the evidence in a murder case would

support a verdict of manslaughter, and defendant does not request an instruction on manslaughter, the decision on whether to give such an instruction is within the discretion of the trial judge (*People v. Taylor* (1967), 36 Ill. 2d 483, 224 N.E.2d 266), and that the trial judge did not abuse his discretion in the instant case, because he could reasonably have assumed that defendant was gambling that if the jury were given only a murder instruction, they would be more likely to acquit him.

■ Supreme Court Rule 451(c) provides that "substantial defects are not waived by failure to make timely objections [to instructions] if the interests of justice require." (107 Ill. 2d R. 451(c).) This rule is a limited exception to the waiver rule and applies only in cases of grave error, where the case is factually close and fundamental fairness requires that the jury be properly instructed. (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.) This is not a case of defense counsel neglecting to request a voluntary manslaughter instruction; rather, defendant never contended that he had acted under a sudden passion. Thus, although there may have been evidence to suggest that one could have acted under such a passion, there was no evidence to support defendant's claim that he did. The trial court did not err in failing *sua sponte* to instruct the jury on voluntary manslaughter.

Defendant next argues that he was denied a fair trial by the prosecutor's remarks during opening and closing arguments. During opening argument, the prosecutor told the jury:

"[Y]ou will learn that Donald Curry and Elizabeth Bradley laid [*sic*] on the living room floor, and they were watching T.V., kind of watching T.V., half dozing off into sleep; a common activity that I am sure we have all done at one time or another.

\* \* \*

And you will learn that Eddie Alvarez also came to 1426 West Leland, and he came there with a knife. He came there with a large butcher knife, and he came there to do one thing; to kill Donald Curry.

\* \* \*

Well, that was the opportunity that the man needed, because what he did was, he came to the stairwell that led directly to the apartment of Debra Carroll, and climbed up to the second floor, and entered into the apartment \* \* \*. From the kitchen, he moved into the dining room. From the dining room, he began walking directly toward the street, which is the front of the apartment, and that is where the living room is located; that is where Donald Curry was lying on the floor, looking at televi-

sion, and Elizabeth Bradley was lying beside him.

\* \* \*

You will learn that Donald Curry began to move, and began to try to prevent the attack of Eddie Alvarez; and, at the time he was being attacked, he looked at who his attacker was. He saw that it was Eddie Alvarez, a man he had known for years."

Defendant asserts that the prosecutors knew that they had no evidence to show that Bradley and the victim were awake, that defendant came to the apartment armed with a butcher knife, that the victim struggled with defendant or that he knew defendant. He emphasizes that there was no testimony to show that he did not arrive at the apartment with the victim, or that Eric Hakanson permitted him to enter through the front door. Defendant claims that the prosecutor gave testimony in his opening argument, knowing that he was filling in gaps in a weak case.

During closing argument, the prosecutor again described "a killer in the alley[,] who was creeping from the alley through the gangway, up the stairs and up to the second floor \*\*\* where he found who he was looking for, Donald Curry." Defendant asserts that there was no evidence that his actions were premeditated. As noted previously, the prosecutor also referred to "other witnesses \*\*\* you know how they responded," and that "[t]hey all named Eddie Alvarez." Defendant complains that during trial, the prosecutors questioned Officer Fuith in such a manner that purported identifications of defendant by Bradley and Eric Hakanson, two witnesses who did not testify, were brought before the jury. That testimony, he charges, combined with the prosecutor's closing remarks, prejudiced him and denied him a fair trial.

The State maintains that its opening argument was proper and that the prosecutors merely made inferences from the evidence. It also contends that defendant did not complain of its opening argument in his post-trial motion and that he has waived the issue on appeal. It claims that the trial judge cured any error during trial by instructing the jury to disregard any improper questions. Defendant did not object to the references during closing argument to "a killer \*\*\* creeping through the alley," and the State argues that he has therefore waived that issue on appeal. Finally, the State argues that any error was harmless and does not warrant reversal.

■■ ■ It is improper for a prosecutor to include matters in her opening statement which are not proved thereafter; however, absent deliberate misconduct on the part of the prosecutor, the error is not

grounds for reversal unless it resulted in substantial prejudice to defendant. (*People v. Kelly* (1985), 134 Ill. App. 3d 732, 741-42, 480 N.E.2d 1343.) In the instant case, the prosecutors did more than draw inferences, they supplied unproven facts. They also improperly questioned Fred Hakanson on the substance of Eric Hakanson's statements to the police, and during rebuttal argument they implied that both Bradley and Eric had identified defendant. This conduct does not mandate a reversal of defendant's conviction, however, because although the prosecutors displayed "excessive and improper zeal," they did not engage in deliberate misconduct. Moreover, these comments did not "substantially prejudice" defendant, since the evidence of his guilt was overwhelming.

Defendant's final argument is that the trial judge improperly sentenced him to 50 years' imprisonment. The term of imprisonment for murder is not less than 20 years and not more than 40 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1).) An extended term of not less than 40 years but not more than 80 years may be imposed if factors in aggravation are present. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2.) Here the trial court made a finding that the crime was exceptionally brutal and heinous, and defendant contends that the evidence in this case does not support such a finding. He argues that, but for the victim's poor health, this would be a case of aggravated battery. The State maintains that the sentence is a proper exercise of judicial discretion.

In sentencing defendant, the judge noted that defendant was clearly identified, that he was in another person's home, that there was no indication of a struggle and that there were multiple stab wounds as opposed to a single stab wound. Although the judge was told that defendant was on probation when the stabbing took place, it appears from the record that defendant completed his probation approximately two months prior to committing this offense. However, the judge was correctly informed that defendant was convicted of larceny of an auto in 1961, theft in January 1968, theft in May 1968, possession of marijuana in 1975, and aggravated battery in 1983.

■■ ■ A trial court's decision on sentencing is entitled to great weight and deference (*People v. La Pointe* (1982), 88 Ill. 2d 482, 431 N.E.2d 344) and will not be disturbed on review absent a showing of abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) An appellate court is not to substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently had the task of sentencing been charged to it. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) Defendant

has not shown that the trial court abused its discretion in sentencing him to an extended term; thus, his sentence must be affirmed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.