THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OWEN TURNER, Defendant-Appellant.

First District (4th Division) No. 1—89—3000

Opinion filed December 10, 1992.

Randolph N. Stone, Public Defender, of Chicago (Renee C. Graham, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Stephen Ferrucci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Owen Turner, was indicted along with six co-defendants on the charges of murder, armed robbery, and conspiracy to commit murder. The trial court granted severances and ordered that all defendants be tried separately. Following a jury trial, defendant was convicted of murder and of armed robbery and received concurrent sentences of 40 years and 30 years, respectively.

On appeal, defendant contends that the trial court erred in (1) admitting evidence of other crimes, (2) admitting testimony by Officer Smulevitz that he took defendant to police headquarters for "the test," (3) penalizing defendant for exercising his constitutional right to a trial, (4) denying his motion to quash arrest and to suppress evidence where the State failed to establish valid consent or exigent circumstances to justify the warrantless entry into defendant's home, (5) denying his motion to quash arrest and to suppress evidence where the State failed to establish that the police officers had probable cause to arrest him, (6) ruling that his arrest on an unrelated charge was not a pretext for holding him on the instant offense, (7) denying his motion to suppress statements where the State failed to establish that those statements were knowingly, intelligently, and voluntarily made, and (8) imposing excessive sentences.

We affirm.

BACKGROUND

The evidence adduced at trial established that the victim, Tijuan Hicks, was robbed and fatally shot at approximately 11:30 p.m. on December 27, 1987, while he was delivering a pizza. The shooting occurred outside the Chicago Housing Authority (CHA) apartment building located at 2514 West Van Buren Street. When Chicago police officers Glenn Turner and Darrin Hill arrived at the scene, they found Hicks' car double-parked in front of the apartment building. The car doors were open, and Hicks' body was lying partially outside of the car. During their investigation, the police discovered that the pizza had been ordered by Cynthia Coleman at the request of Melvin Jones. The police ultimately charged defendant, Jones, and five other codefendants with the shooting and armed robbery of Hicks.

Prior to trial, defendant filed a motion to quash arrest and to suppress evidence which alleged that he was arrested in violation of his fourth amendment right to be free from unreasonable searches and seizures. Specifically, defendant asserted that the officers arrested him without a valid warrant, probable cause, or exigent circumstances.

At the hearing on this motion, defendant's sister, Patricia Ford, testified that she and defendant were at home on December 28, 1987, when three police detectives came to their apartment. When she answered the door, Detective Gene Harris asked whether defendant lived there. Ms. Ford said that he did and indicated that he was in the bathroom. Thereafter, Detective Harris entered the apartment along with the two other detectives. Ms. Ford denied that she had given the officers permission to enter.

Ms. Ford testified further that she heard a knock at the bathroom door and heard Detective Harris tell defendant to come out. After defendant came out of the bathroom, he left with Harris and was handcuffed outside the apartment. On cross-examination, Ms. Ford stated that when she opened the apartment door, Detective Harris identified himself as a Chicago police officer, and she acknowledged that she had not complained that the police entered her house without permission until the motion to suppress was presented. Ms. Ford also testified that defendant was not searched, handcuffed, or advised of his constitutional rights while inside the apartment.

The testimony of defendant's mother, Earnestine Turner, corroborated that of Patricia Ford. Mrs. Turner stated further that Detective Harris said he wanted to bring defendant to the police station for an hour in order to ask him some questions. On cross-examination Mrs.

Turner acknowledged that she was not paying much attention when the apartment door was opened. Mrs. Turner also admitted that she had never complained that the police officers entered her house without her consent.

The State called Detective Gene Harris, who testified that on December 28, 1987, he was investigating the shooting death of Tijuan Hicks. At approximately 3 p.m., he and two other detectives went to defendant's home in an effort to learn the whereabouts of Melvin Jones. Harris knocked at the door, and a young woman answered. The detectives then identified themselves, displayed their badges, and stated their reason for being there. According to Harris, the woman identified herself as defendant's sister and invited them into the apartment.

Detective Harris testified further that the young woman called out to defendant that the police were there and wanted to speak with him. A short time later, another woman identified herself as defendant's mother, and Harris explained to her the purpose of their visit. According to Harris, he and the other two detectives were in the apartment for approximately 35 minutes. During that time, they also spoke with Sharolynn Turner, another of defendant's sisters. After several minutes, defendant walked from the rear of the apartment and into the living room with co-defendant Burl Pickett, who identified himself as Lawrence Williams. Harris asked defendant about the shooting of Hicks and inquired as to where they could find Melvin Jones. At that time, defendant agreed to help locate Jones and to accompany the detectives to the police station. Thereafter, defendant went to the station along with the three detectives, his sister, Sharolynn, and Pickett. Detective Harris testified that defendant was not placed under arrest and was not handcuffed when they left the apartment.

When they arrived at the police station at about 4:30 p.m., Detective Harris spoke with defendant and with defendant's sister, Sharolynn. Harris subsequently contacted Sergeant Steele of the public housing police unit in an attempt to locate Melvin Jones. Steele told Harris that defendant was a suspect in an unrelated armed robbery. The victim of that armed robbery was brought to the station, and she identified defendant in a lineup. Defendant was charged with that robbery at approximately 8 p.m. on December 28, 1987.

Detective Harris testified that defendant was still at the police station at 10 a.m. of the following day, when Harris again spoke with Sharolynn Turner. Ms. Turner said she had learned from Fellini Evans that Levy Jackson shot Hicks. Harris later spoke with Fellini

Evans, Levy Jackson, Joel Buckingham, and Robert Simmons. At approximately 1 p.m. on December 29, 1987, defendant was charged along with Evans, Jackson, Buckingham, and Simmons with the murder and armed robbery of Hicks. Harris stated that defendant was not handcuffed while he was in the interview room at the police station and that defendant was advised of his constitutional rights after Harris talked to Steele about the unrelated armed robbery.

The defense then called Sharolynn Turner in rebuttal. Ms. Turner stated that the police first came to her apartment at 3 a.m. on December 28, 1987, and asked whether Melvin Jones was there. When Ms. Turner said he was not, they asked about defendant. Ms. Turner said that defendant was home and, after waking him, asked him when he had last seen Jones. After defendant said that he had not seen Jones in several months, the police officers left.

Ms. Turner testified that when she arrived at her mother's house at 10 a.m. that morning, she saw Detective Harris and two other detectives in the apartment. After defendant got dressed, the officers took him to the police station for questioning. According to Ms. Turner, defendant was handcuffed outside the apartment. Ms. Turner stated on cross-examination that she did not leave her mother's apartment when the officers took defendant to the police station, and she denied having a conversation with Fellini Evans in which Evans told her that Levy Jackson was the person who shot Hicks.

Upon consideration of this evidence and the arguments of counsel, the trial court denied defendant's motion to quash arrest and to suppress evidence. In entering his ruling, the trial judge specifically found that the officers had been invited into defendant's apartment, and there had been no forcible entry. The trial judge stated that the police detectives went to defendant's home in an effort to locate Melvin Jones, and defendant was not a suspect in the case at that time. Noting the conflict in the testimony, the court determined that defendant had not been handcuffed outside the apartment and was not under arrest when he was taken to the station. The court also found the testimony of Detective Harris credible and held that defendant voluntarily went to the police station to assist the police in the murder investigation. The court found further that the police had probable cause to arrest defendant on December 29, 1987.

Defense counsel also filed a motion to suppress defendant's statement on the ground that it was not voluntary. At the hearing on this motion, the State called Officer Thomas Jones, who testified that on December 29, 1987, while investigating the shooting of Tijuan Hicks, he spoke with defendant at approximately 8 p.m. in an interview

room at the police station. Detective DalPonte and Assistant State's Attorney Needham were also present during this conversation. According to Jones, defendant was not handcuffed and agreed to speak with the officers after he was advised of his constitutional rights. Jones testified further that he was present on December 30, 1987, at 1:30 a.m., when defendant gave his court-reported statement. Jones stated that he did not see anyone slap, strike, threaten, or physically abuse defendant, and defendant did not complain of any physical mistreatment.

Detective Harris also testified that on December 29, 1987, he spoke with defendant about the shooting of Hicks after defendant had been advised of his constitutional rights and stated that he understood those rights. Harris stated that defendant was not struck or threatened before he gave his statement. In addition, defendant did not complain of any mistreatment and was not handcuffed during this conversation.

Sergeant Steele testified that he spoke with defendant at 6 p.m. on December 28, 1987, regarding a robbery in which defendant was a suspect. After advising defendant of his constitutional rights, which defendant said he understood, Sergeant Steele placed defendant in a lineup. Steele testified that defendant was not handcuffed and had not been slapped, struck, or threatened in any way.

The State also called Detective DalPonte, whose testimony corroborated that of Officer Jones. DalPonte denied that defendant had been handcuffed, slapped, struck, or threatened prior to giving his statement.

Defendant testified that on December 28, 1987, at about 11 a.m., he was brought from his home to the police station and placed in a second-floor interview room. At that time, Detective Harris advised defendant of his constitutional rights and questioned him for about 15 minutes.

Defendant testified further that on December 29, 1987, while in a different interview room, another detective asked him about Melvin Jones. Defendant told the detective that he had last seen Melvin Jones two weeks earlier. Defendant testified that the detective then threatened him if he refused to cooperate. Defendant also stated that he later spoke with Sergeant Steele, who asked whether he had seen Melvin Jones. Steele then told defendant that he would be charged with robbery. Defendant testified that after he denied responsibility for the robbery, Steele slapped him in the face and threatened him if he refused to cooperate.

Defendant stated that Detective DalPonte then came into the room and asked him about the murder of Hicks. When defendant denied knowing anything about it, DalPonte brought him to a different room and handcuffed him to a bar. According to defendant, DalPonte threatened to do something to him if he sat down. According to defendant, DalPonte returned 15 minutes later and hit defendant with a chair because he was sitting on the floor.

Defendant went on to state that Detective Harris came into the room and spoke to him for 30 minutes. After Detective Harris left, another detective entered and asked him a question which he did not answer. Defendant then testified that while the door was closed and he was handcuffed to the bar, he was struck twice in the ribs. At that point defendant told the detective that he knew something about the case. Defendant added that he later gave a statement because the police threatened to charge him with the crime if he did not cooperate with the State's Attorney.

On cross-examination, defendant testified that he never told anyone at the jail about being beaten, he did not make any complaints to the police department, and he never mentioned any mistreatment to his friends or family. Moreover, defendant did not tell anyone about the mistreatment until motions were filed in his case.

The trial court denied defendant's motion, finding that defendant gave his statement knowingly, intelligently, freely, and voluntarily. This ruling was predicated upon the court's determination that the police officers presented credible testimony that no force was used to obtain the statement.

Defense counsel also filed a motion *in limine* to preclude the introduction of evidence that defendant was involved in an unrelated robbery on December 15, 1987, and to exclude all references to those portions of his oral and written statements which referred to purchasing and smoking marijuana or "leaf." The trial judge granted defendant's motion, but indicated that he might reconsider that ruling.

Prior to the close of the State's case in chief, the trial judge determined that it was necessary to reconsider his ruling on the motion *in limine*. The court held that the State would be permitted to introduce evidence that defendant was in custody from approximately 6 p.m. on December 28, 1987, for the prior, unrelated robbery. The court indicated that this evidence was admissible to rebut the inference that defendant had been held for over 24 hours before he gave his inculpatory statement. The trial court also reversed its previous ruling excluding the admission of evidence that defendant had used controlled substances on the night of the murder.

At trial, Chicago police officer Glen Turner testified that on December 27, 1987, he and his partner received a radio call indicating that a man had been shot at 2514 West Van Buren Avenue. At the scene, he observed a car which was double-parked, with its front doors open, and Tijuan Hicks was lying outside the car. Hicks was bleeding from a gunshot wound to the right side of his neck. The officer also found a pizza box lying about 10 feet from the car. From information on the pizza box, Officer Turner discovered that the pizza had been ordered by Cynthia Coleman.

Cynthia Coleman testified that at approximately 10 p.m., on December 27, 1987, she was talking on the telephone when Melvin Jones asked her to order a pizza for him. Ms. Coleman complied with this request and then resumed her telephone conversation. Ms. Coleman stated that she was acquainted with defendant because she had seen him walking with Melvin Jones in the vicinity of her apartment building.

Merny Miller, an employee of Illinois Bell's security department, testified that a telephone call was made to a pizza parlor at approximately 10:49 p.m. on December 27, 1987, from Cynthia Coleman's apartment.

Detective Leslie Smulevitz testified that on December 28, 1987, at approximately 10:30 p.m., he went with defendant to 1121 South State Street for "the test." Defense counsel immediately requested a sidebar and moved for a mistrial, asserting that the jury could have determined that this testimony referred to a polygraph test. After the trial court denied the motion for a mistrial, Smulevitz stated that at approximately 1 a.m. on December 29, 1987, defendant acknowledged that he had information regarding the homicide of Tijuan Hicks. After he had been advised of his constitutional rights, defendant stated that on December 27, 1987, he had been smoking PCP-laced marijuana in apartment 907 at 2514 West Van Buren. Upon hearing a gunshot, he went to the window and observed two people on the passenger side of a car. The right front door was open, and defendant saw a person, wearing a dark jacket and red pants, fire a shot into the car. Defendant then stated that he was unable to describe the scene further because his vision was "fogged" by what he had been smoking.

Detective Gene Harris testified that on December 28, 1987, he questioned defendant regarding the murder of Hicks. Defendant told the detective that he was at 2514 West Van Buren, apartment 907, on the previous evening. At about 11 p.m., he heard some shots. Defendant stated that he had not paid any attention to the shots because he and a friend were "getting high." Harris also stated that on Decem-

ber 29, 1987, he confronted defendant and advised him of his rights. Defendant admitted that he had not been truthful and stated that he was ready to tell the truth.

According to Harris, defendant stated that at 9 p.m. on December 27, 1987, he was at his sister's apartment along with Burl Pickett, Joel Buckingham, and Robert Simmons. Later, they were joined by Melvin Jones, Fellini Evans, and Levy Jackson. As they were talking, someone said that they needed cash, and Melvin Jones suggested robbing a pizza delivery man. Jones then left but returned shortly with a .38 caliber bluesteel revolver. Thereafter, Jones left the apartment again and returned, stating that the men could go downstairs because the delivery man was on his way.

Defendant then told Harris that the seven men waited in the vestibule until Tijuan Hicks pulled up to deliver the pizza. At that time, defendant approached the car with Levy Jackson and Robert Simmons. As Hicks opened the right front door, Levy Jackson shot him twice, and Robert Simmons grabbed the pizza. Defendant was standing on the passenger side of the car and inside of the building. Defendant told Harris that he could not hear the conversation between Jackson and Hicks very clearly. After defendant heard the first shot, the passenger door of the car opened. When the second shot was fired, the driver's door opened. Jackson then got into the car, and everyone ran back into the building. After returning to apartment 907, the seven men ate the pizza. Jackson said he took all of Hicks' money, which amounted to $11. Thereafter, defendant and three others then took the money and went to another apartment building to purchase drugs.

Dr. Mary Irene Jumbelic of the Cook County medical examiner's office testified that she performed a postmortem examination on Hicks. As a result of her examination, she concluded that Hicks died as a result of multiple gunshot wounds, one on the front left side of his neck, and one to the right side of his back.

Assistant State's Attorney Thomas Needham stated that at 8 p.m. on December 29, 1987, he spoke with defendant at the police station. According to Needham, defendant indicated that he wanted to give a statement to a court reporter. At approximately 1:30 a.m. on December 30, 1987, a court reporter arrived at the station, and Needham asked defendant whether he wished to give a statement. Defendant responded that he did, and the statement was then taken by the court reporter. When defendant finished his statement, Needham read the statement to defendant, who signed the last page, and stated verbally

that the statement was an accurate description of the events of December 27, 1987.

Defendant's statement, which corroborated the testimony of Detective Harris, was read into the record.

During closing arguments, the prosecutor commented on the evidence that defendant had purchased and used illegal drugs on the night of the murder. The prosecutor also referred to the evidence that defendant was being held on an unrelated matter prior to his arrest for the instant offense. Thereafter, the jury found defendant guilty of murder and of armed robbery.

At the sentencing hearing, the State presented defendant's juvenile background, which included an adjudication of delinquency for burglary in January 1983 as well as a probationary term of two years for robbery in December 1984. Defendant was also sentenced in February 1986 to 20 days in the Audy Home for possession of a stolen motor vehicle. Although defendant had no prior convictions as an adult, the State informed the court, over defense counsel's objection, that defendant was free on bond for a pending weapons charge when he was arrested.

Defense counsel argued in mitigation that defendant should receive the minimum sentence because his convictions were based upon accountability. Defense counsel also argued that because defendant did not bring the gun or actually shoot Hicks, the State proved only that defendant was standing in the vicinity of the car when Hicks was shot.

Noting that defendant had chosen to go to trial, the trial judge imposed the maximum sentences possible for each conviction. In ruling that defendant serve a term of 40 years for murder and a concurrent term of 30 years for armed robbery, the trial judge stated that he would have sentenced defendant to a term of 60 years if defendant had been convicted under the new statute, which provided a maximum penalty of 60 years. The trial judge also stated that he could not impose an extended term or a life sentence without parole.

Defendant appeals his convictions and sentences, raising eight grounds for reversal.

OPINION

I

Defendant initially contends that the trial court erred in admitting evidence of other crimes. Specifically, defendant challenges the trial court's admission of evidence that he had been charged in an unre-

lated armed robbery and that he had purchased and used controlled substances on the night of the murder.

Evidence of other crimes may be admitted if relevant to establish any fact material to the prosecution other than the propensity of the defendant to commit a crime. (*People v. Illgen* (1991), 145 Ill. 2d 353, 365, 583 N.E.2d 515; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145; *People v. Summers* (1990), 202 Ill. App. 3d 1, 17, 559 N.E.2d 1133.) When such evidence is offered, the trial judge must weigh its probative value against its prejudicial effect and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. (*Illgen*, 145 Ill. 2d at 365; *People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.) Evidence is considered relevant if it has the tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. *Illgen,* 145 Ill. 2d at 365-66; *Stewart*, 105 Ill. 2d at 54.

■ In the case at bar, the evidence reflected that defendant arrived at the police station at about 4:30 p.m. on December 28, 1987, and remained there until he was charged with Hicks' murder at 1 p.m. on December 29, 1987. Defendant ultimately gave a statement at about 1:40 a.m. on December 30, 1987. This evidence, standing alone, would indicate that defendant had been held at the station for almost 22 hours before he was charged and for over 34 hours before he gave his inculpatory statement. In reconsidering his decision on the motion *in limine*, the trial judge determined that the prosecution should be permitted to introduce evidence which would establish that defendant was charged with the prior unrelated robbery at 8 p.m. on December 28, 1987, and thereafter remained in custody for that offense. This evidence was properly admitted to rebut the presumption that defendant had been held on the instant charge for over 34 hours before he gave his inculpatory statement. Because defendant's statement was a pivotal factor in the State's case, it was appropriate for the jury to be informed of all of the facts which might reflect upon the validity and voluntariness of that statement. Consequently, we hold that the State was properly permitted to present evidence which would refute the claim that defendant's statement had been coerced during an extended and unjustified period of custodial interrogation.

We also find that defendant was not prejudiced by the admission of evidence that he purchased and used controlled substances on the night of the murder. This evidence was properly admitted to establish

defendant's motive for committing the crime where he stated that he and three others used the proceeds to buy drugs. Moreover, admission of this evidence does not constitute reversible error where there was sufficient competent evidence to establish defendant's guilt beyond a reasonable doubt. See *People v. Chianakas* (1983), 114 Ill. App. 3d 496, 505, 448 N.E.2d 620.

The decision of the trial court regarding the admissibility of evidence of other crimes will not be disturbed on review unless it constitutes a clear abuse of discretion. (*Illgen*, 145 Ill. 2d at 364; *People v. Franklin* (1990), 135 Ill. 2d 78, 96, 552 N.E.2d 743, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 182, 111 S. Ct. 228; *Summers*, 202 Ill. App. 3d at 18, 559 N.E.2d at 1143.) We find no abuse of discretion in the instant case.

## II

Defendant also asserts that the court erred in denying his motion for a mistrial, which was based upon the testimony that Officer Smulevitz took defendant to police headquarters for "the test." Defendant argues that the admission of this evidence entitles him to a new trial because the jury could have concluded that this statement referred to a polygraph test.

Although the results of a polygraph test are inadmissible, the admission of evidence that the defendant has taken such a test does not necessarily constitute reversible error. (See *People v. Melquist* (1962), 26 Ill. 2d 22, 30, 185 N.E.2d 825; *People v. Flowers* (1958), 14 Ill. 2d 406, 413-14, 152 N.E.2d 838.) The decision of whether to grant a mistrial is within the sound discretion of the trial court, and that determination will not be disturbed unless it appears that there was a manifest necessity for a mistrial or the ends of justice would be affected by continuing the trial. (*People v. Alvarez* (1989), 186 Ill. App. 3d 541, 549, 542 N.E.2d 737.) It must appear that the jury has been so influenced and prejudiced that it cannot be fair and impartial. (*Alvarez*, 186 Ill. App. 3d at 549.) The determination of whether jurors have been prejudiced is left to the sound discretion of the trial court. (*People v. Martinez* (1977), 45 Ill. App. 3d 939, 942, 360 N.E.2d 495.) Further, a determination of prejudice rests not only upon what the jury says, but also upon the nature of the material and upon all of the facts and circumstances in the record. (*People v. Rogers* (1985), 135 Ill. App. 3d 608, 626, 482 N.E.2d 639.) Moreover, not every situation in which extraneous or unauthorized information reaches the jury results in prejudice. *Rogers*, 135 Ill. App. 3d at 626.

▆ The record in the instant case reveals that Officer Smulevitz never referred to a polygraph test. The trial court specifically held that his statement could have referred to several examinations, including a blood-alcohol test, a drug test, or fingerprints. The record does not reflect that this comment influenced or prejudiced the jury against the defendant. Thus, there is no indication that admission of this evidence affected the jury in such a way that it could not be fair and impartial in reaching its decision. Based upon the record before us, we hold that defendant is not entitled to a new trial on this basis.

## III

Defendant next argues that the trial court penalized him for exercising his constitutional right to a trial.

A sentence will be set aside where the record clearly indicates that the trial judge was predisposed to impose a more severe sentence because the defendant exercised his right to a trial rather than entering a guilty plea. *People v. Moriarty* (1962), 25 Ill. 2d 565, 567, 185 N.E.2d 688.

In sentencing defendant, the trial judge stated, *inter alia*, "[t]he shooter in this case, the one that actually used the weapon and caused the death is now serving 70 years, based upon a plea. In this case, you saw fit to go to trial."

▆ Contrary to defendant's claim, we are not persuaded this comment indicates that the trial court penalized defendant because he did not enter a plea of guilty. In our view, this statement merely reflected the judge's assessment of defendant's culpability for the murder of Hicks where each of the seven men present was charged as a participant in the crime. We hold that the trial judge's comments, when taken in their entirety, reflect the court's finding that defendant was responsible for the shooting of Hicks and was as culpable as the person who actually pulled the trigger. Consequently, we hold that defendant has not established the trial judge was predisposed to impose a more severe sentence based upon defendant's decision to exercise his right to a trial.

## IV

Defendant also contends that the court erred in denying his motion to quash arrest and to suppress evidence where the State failed to establish valid consent or exigent circumstances to justify the warrantless entry into defendant's home. This argument is without merit.

On a motion to suppress evidence, the defendant has the burden of proving the search and seizure were unlawful (Ill. Rev. Stat. 1991,

ch. 38, par. 114—12(b); *People v. Hoskins* (1984), 101 Ill. 2d 209, 212, 461 N.E.2d 941), and a trial court's decision will not be reversed unless it is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162, 535 N.E.2d 837; *Hoskins*, 101 Ill. 2d at 212; *People v. Chavez* (1992), 228 Ill. App. 3d 54, 66, 592 N.E.2d 69.) Whether consent to enter was voluntary is a question for the trier of fact to be determined from the totality of the circumstances and will not be set aside unless it is clearly erroneous. *Chavez*, 228 Ill. App. 3d at 66-67.

■ At the hearing on defendant's motion to suppress, Detective Harris testified that defendant's sister, Patricia Ford, invited him and the other two officers into the apartment after they had identified themselves and displayed their badges. Although Ms. Ford denied that she had given the detectives permission to enter, the trial judge was obligated to assess the credibility and weight of the testimony and to resolve any conflicts therein. (*People v. Clay* (1973), 55 Ill. 2d 501, 504, 304 N.E.2d 280.) The judge specifically found the testimony of the officers credible and held that defendant's sister voluntarily permitted the officers to enter the apartment. Accordingly, the court denied defendant's motion to suppress. Because we do not believe that this determination was manifestly erroneous, we hold that defendant has not established that his fourth amendment rights were violated.

### V

Defendant next asserts that the police lacked probable cause to arrest him. In support of this assertion, defendant contends that he was placed under arrest at approximately 11 a.m. on December 28, 1987, when he was taken to the police station by Detectives Harris, Jones, and DalPonte. The trial court determined, however, that defendant was not placed under arrest until 1 p.m. on December 29, 1987, when he was formally charged with the murder of Hicks.

In determining whether an arrest has taken place, the question is not simply whether the officer's conduct was reasonable under the circumstances, but whether a reasonable, innocent person in the defendant's situation would have considered himself free to leave. See *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766; *People v. Townes* (1982), 91 Ill. 2d 32, 37, 435 N.E.2d 103; *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870.

The mere fact that questioning took place in a police station is not in and of itself sufficient to convert the questioning into an arrest. (*People v. Matthews* (1990), 205 Ill. App. 3d 371, 402, 562 N.E.2d 1113; *People v. Longoria* (1983), 117 Ill. App. 3d 241, 250, 452 N.E.2d

1350.) Numerous factors must be considered, including the location of the interrogation, any statement or nonverbal conduct by the police which indicated that the accused was not free to leave, the extent of the knowledge of the police officers and the focus of their investigation, and the intentions of the officers. (*Matthews*, 205 Ill. App. 3d at 402-03.) A reviewing court must also consider the time, length, mood and mode of the interrogation, the number of police officers present and the presence or absence of friends or family of the accused, the manner in which the person questioned got to the place of interrogation, whether he was allowed to walk within and from the location of interrogation unaccompanied by police, and the age, intelligence, and mental makeup of the accused. *Matthews*, 205 Ill. App. 3d at 403; *People v. Smith* (1986), 150 Ill. App. 3d 524, 528, 501 N.E.2d 1010; *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226.

■ The detectives who investigated the murder of Tijuan Hicks testified that defendant voluntarily agreed to accompany them to the police station and to assist them in finding Melvin Jones, who was the focus of their murder investigation. They testified further that defendant was not handcuffed until he was formally arrested at 1 p.m. on December 29, 1987. They stated further that defendant was not hit or physically or mentally coerced into cooperating with them in their efforts to locate Melvin Jones.

The trial judge was obligated to assess the credibility and weight of the testimony and to resolve conflicts therein. (*Clay*, 55 Ill. 2d at 504.) The judge specifically found the testimony of the officers credible. Based upon the record before us, we find that the evidence supported the trial court's determination that defendant's fourth amendment rights were not violated by the investigation and interrogation conducted by the police detectives.

We also find that the police had probable cause to arrest defendant at 1 p.m. on December 29, 1987.

The issue of whether probable cause exists is a commonsense, practical question to be determined upon examination of the totality of the circumstances presented. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Probable cause exists if a police officer has knowledge of facts which would lead a reasonable person to believe that a crime has been committed and that it was committed by the defendant. (*People v. Neal* (1985), 111 Ill. 2d 180, 193, 489 N.E.2d 845.) Although an arrest may not be based upon a mere suspicion that the individual may have committed the offense, an arresting officer is not required to have sufficient evidence to convict the accused beyond a reasonable doubt. *People v. Moody* (1983),

94 Ill. 2d 1, 7, 445 N.E.2d 275; *People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147.

Defendant argues that prior to his arrest, the police did not have knowledge of sufficient facts to support a reasonable belief that he was responsible for the shooting of Hicks. We disagree.

The record establishes that before defendant was arrested for the instant offense, Detective Harris had spoken with defendant and his sister, Sharolynn Turner, as well as codefendants Fellini Evans, Levy Jackson, Joel Buckingham, and Robert Simmons. Through these conversations, Harris learned that defendant was a friend of Melvin Jones and that Jones had ordered the pizza delivered by Hicks. In addition, defendant admitted that he was at the scene on the night of the murder. Harris learned from Sharolynn Turner that Fellini Evans identified Levy Jackson as the man who shot the gun which killed Hicks. After speaking with Evans, Jackson, Buckingham, and Simmons, Harris confronted defendant. Defendant then acknowledged that he had lied and that he was ready to tell the truth.

This evidence indicates that Detective Harris had knowledge of sufficient facts which would lead a reasonable person to believe that defendant was responsible for the shooting of Hicks. We hold, therefore, that the trial judge correctly denied defendant's motion to quash arrest.

## VI

Defendant argues that the trial court erred in ruling that his arrest on an unrelated charge was not a pretext for holding him on the instant offense. In support of this argument, defendant asserts that the police lacked probable cause to arrest him for an unrelated armed robbery and that this arrest was a subterfuge for holding him until a statement could be extracted from him for the instant offense. This claim is without merit.

■ The record reveals that Detective Harris contacted Sergeant Steele of the Chicago Housing Authority police squad in an effort to locate Melvin Jones. Steele told Harris that defendant was a suspect in an unrelated armed robbery. Upon further investigation, Harris confirmed that defendant had been named as an offender in that armed robbery. Harris then contacted the victim, and she came to the police station where she positively identified defendant in a lineup as the man who had robbed her. Defendant was subsequently charged with that armed robbery.

Where the victim of the crime supplies the police with the information forming probable cause, there is a presumption that this infor-

mation is inherently reliable. *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 874-75, 463 N.E.2d 864.

The evidence in the record established that the police were aware of sufficient facts to support a reasonable belief that defendant had committed the armed robbery. We conclude that the trial judge correctly denied defendant's motion to quash arrest.

## VII

Defendant also contends that the court erred in denying his motion to suppress statements where the State failed to establish that those statements were knowingly, intelligently, and voluntarily made.

The determination of whether a statement was given freely must be based upon the facts and circumstances of each case, and no single fact is dispositive. (*Rawlings v. Kentucky* (1980), 448 U.S. 98, 106-07, 65 L. Ed. 2d 633, 642-43, 100 S. Ct. 2556, 2562.) The pivotal factors to be considered include whether the accused was advised of his constitutional rights, the presence of intervening circumstances, the temporal proximity of the arrest and the statement, and the purpose and flagrancy of the official misconduct involved in the allegedly illegal detention. (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62; *People v. Bracy* (1986), 152 Ill. App. 3d 566, 571, 504 N.E.2d 764.) Of these factors, temporal proximity is the least determinative factor. (*People v. Malloy* (1982), 104 Ill. App. 3d 605, 607, 432 N.E.2d 1291.) The credibility of the witnesses regarding the voluntariness of a statement is to be determined by the trial court, and that determination will not be overturned unless it is contrary to the manifest weight of the evidence. *People v. Weger* (1962), 25 Ill. 2d 370, 374, 185 N.E.2d 183; *In re Bizzle* (1976), 36 Ill. App. 3d 321, 325, 343 N.E.2d 633.

■ The trial court found that the testimony of the police officers was credible and concluded that defendant's statement was given voluntarily and not as a product of coercion or physical abuse. This conclusion is more than amply supported by the evidence in the record. Defendant's testimony that his statement was coerced through threats and physical abuse was directly controverted by the testimony of Officer Jones, Detective Harris, Sergeant Steele, and Detective DalPonte. The police officers also testified that defendant was advised of his constitutional rights on at least three different occasions during his interrogation and prior to his court-reported statement. According to the officers, defendant stated that he understood each of his rights as it was read to him. Defendant also agreed to give a court-reported statement after he had been advised of his rights and had indicated

that he understood them. Based upon this evidence, we hold the trial court correctly found that defendant's statements were voluntary and admissible.

## VIII

Finally, defendant argues that the sentences imposed for his convictions were excessive.

In considering the propriety of punishment, a court of review must give great weight to the judgment of the trial court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E. 2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882; *People v. Bergman* (1984), 121 Ill. App. 3d 100, 110, 458 N.E.2d 1370.) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*Perruquet*, 68 Ill. 2d at 153.) Additionally, the trial judge is normally in a better position to determine the punishment to be imposed than is a court of review. *Perruquet*, 68 Ill. 2d at 154; *People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330.

A reasoned judgment as to a proper sentence must be based upon the particular facts and circumstances of each individual case. (*Perruquet*, 68 Ill. 2d at 154; *People v. Bolyard* (1975), 61 Ill. 2d 583, 589, 338 N.E.2d 168.) Such a judgment depends upon many factors, including the gravity of the offense and the circumstances of commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history. (*Perruquet*, 68 Ill. 2d at 154; *People v. Duncan* (1981), 97 Ill. App. 3d 896, 899, 424 N.E.2d 67.) The sentencing judge is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541; *Bergman*, 121 Ill. App. 3d at 109.) Yet, the objective of restoring the offender to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense. *People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1, 4; *Bergman*, 121 Ill. App. 3d at 109.

Defendant contends that his sentences were excessive because he was only 17 years old when the offenses were committed, did not have an extensive criminal background, and had great potential for rehabilitation.

The record in the instant case reflects that in sentencing defendant, the trial judge stated that he had considered the evidence presented at trial, the information contained in the presentence re-

port, the factors presented in aggravation and in mitigation, the age and criminal history of the defendant, defendant's participation in the planning and consummation of the offense, as well as the seriousness of the crime.

Thus, the record indicates that the sentencing judge was fully aware of defendant's age, his prior criminal background, and his potential for rehabilitation. Yet, these considerations had to be balanced against the seriousness of the offenses for which defendant had been convicted. Upon review of the record, we hold that the trial judge properly considered all relevant factors, including the rehabilitative potential of the defendant, in making his sentencing decisions. The trial judge sentenced defendant to the maximum term permissible for both offenses. These sentences are not excessive when considered in light of the nature of the crimes with which defendant had been charged. We conclude that the penalties imposed do not reflect an abuse of the trial court's discretion. *People v. Younger* (1986), 112 Ill. 2d 422, 428, 494 N.E.2d 145.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW,* J., concur.

---

*Justice McMorrow participated in the disposition of the case prior to her becoming a member of the supreme court of Illinois.